**NORFOLK and PORTSMOUTH BELT LINE RAILROAD COMPANY,**
Appellant,

v.

**BROTHERHOOD OF RAILROAD TRAINMEN, LODGE NO. 514,**
et al., Appellees.

No. 7416.

United States Court of Appeals
Fourth Circuit.

Argued June 10, 1957.

Decided Aug. 23, 1957.

Writ of Certiorari Denied Jan. 6, 1958.
See 78 S.Ct. 343.

Thomas H. Willcox, Norfolk, Va. (Willcox, Cooke & Willcox, Norfolk, Va., on brief), for appellant.

Robert R. MacMillan, Norfolk, Va. (Breeden, Howard & MacMillan, Norfolk, Va., Wayland K. Sullivan, and Harold C. Heiss, Cleveland, Ohio, on brief), for appellees.

Before SOPER, SOBELOFF and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The carrier, Norfolk and Portsmouth Belt Line Railroad Company, sought in the Circuit Court of the City of Norfolk, and obtained, a temporary injunction against the Brotherhoods representing the members of its train crews and certain of their officers. The temporary in-

junction proscribed any strike or work stoppage on the lines of the carrier pursuant to a strike notice which was to have become effective on September 26, 1956, and which arose out of a controversy regarding the establishment of a new point at which five of the carrier's thirty-four train crews would be required to report for duty. Upon removal of the cause to the District Court of the United States and after a full hearing upon the merits, the District Court ordered the temporary injunction dissolved, though, by supplemental order, the execution of the Court's judgment was suspended pending this appeal by the carrier.

The carrier is a switching terminal and belt line railroad exclusively serving a large number of industries in the Norfolk area. It has interchange facilities with nine other railroads in the area and some of those other railroads are dependent upon it for interchange of their traffic with others. The carrier is engaged in interstate commerce and is subject to the Railway Labor Act, 45 U.S.C.A. § 151 et seq. The defendants, the Brotherhoods, are the representatives of its train crews. The District Court found, and the record clearly establishes, that a work stoppage on the lines of the carrier would occasion irreparable damage to the carrier and to the public and would "substantially paralyze industry in the area involved."

The center of the carrier's lines is Berkley Yard, located in South Norfolk, Virginia. This is the largest classification yard of the company and from that yard branch lines run in several directions. One of them crosses the Southern Branch of the Elizabeth River to Portsmouth, Virginia, from which there are subordinate branches and yards, the principal yard in Portsmouth being known as Port Norfolk Yard. Another line runs from Berkley Yard northerly to terminals on the southern bank of the Eastern Branch of the Elizabeth River. Another of them runs eastwardly to a connection with the Virginian Railroad over the tracks of which, together with those of the Norfolk and Southern, the carrier has operating rights by use of which it serves industries in the City of Norfolk and by which it extends its lines all the way to Sewells Point on Hampton Roads north of the City of Norfolk. Yet another line, with subordinate branches, extends from Berkley Yard in a southerly direction a considerable distance along the Southern Branch of the Elizabeth River.

From 1897 until 1917, Port Norfolk Yard, in Portsmouth, was the sole point at which train crews reported for duty and were relieved. Facilities for servicing steam locomotives were maintained there and the maintenance and service necessities of those locomotives required that they be ordinarily returned to that yard at the end of each shift. In 1917 an additional point at which train crews reported and were relieved was established at Sewells Point. Prior to 1956, except for a short period in 1941–42, when Money Point Yard was a designated point for reporting and relief, Port Norfolk Yard and Sewells Point Yard were the only designated points at which train crews were required to report for duty or to be relieved from duty.

Prior to 1956, therefore, engine crews which were to work at Berkley Yard or out of Berkley Yard would report for duty at Port Norfolk Yard in Portsmouth, to which the locomotive had been brought for servicing. There they picked up the locomotive and would proceed over the lines of the carrier to Berkley Yard or to their other points of work assignment. This travel in the carrier's locomotive after having reported in was, of course, at the carrier's expense and all members of the train crew were on a pay status from the time of reporting in.

The contracts between the carrier and the Brotherhoods, representing members of its train crews, provided that the carrier should maintain certain locker room, shower, toilet and other facilities at each point at which operating employees were required to report or be relieved. Such facilities were maintained only at Port Norfolk Yard and Sewells Point Yard. Upon occasion, it was necessary that op-

erations be substantially continuous in the yards of the Ford Plant and in the servicing of certain fertilizer plants. Upon those occasions, and when the locomotive could operate in those areas for the duration of two full shifts without being brought in for servicing, crews were relieved at the locomotive at those places. Since none of the requisite locker room, shower or other facilities were maintained at those places, however, they could not have been designated as points for reporting and relief. Consequently, when such "footboard relief" was being practiced, the relief crew would report in at Port Norfolk Yard, and would be transported by automobile to the place where the engine was working, while the relieved crew would be returned to Port Norfolk Yard by the same conveyance. In emergency, relief of crews working locomotives at other places was similarly handled.

The record, however, disclosed that there never was any custom or practice of providing transportation of train crews on a pay status to and from areas of their residence and any designated point for reporting and relief. On the contrary the record discloses that eight employees, residing in Portsmouth, were traveling on their own time and at their own expense all the way through South Norfolk and Norfolk to Sewells Point where they reported and were relieved. Conversely, eight other employees, residing in Norfolk or South Norfolk, were required to travel on their own time and at their own expense to Port Norfolk Yard in Portsmouth for reporting and relief.

As in substantially all of the contracts between railroads and Brotherhoods representing train crews, there was a provision in the applicable contracts here that there should be a designated point for going on duty and a designated point for going off duty. Each of the contracts further provides "the point of going on and off duty shall be governed by local conditions * * *."

Against this background, and upon the assumption that under the applicable agreements it had the right to establish additional points for reporting and relief so long as it provided the requisite facilities, the carrier in 1955 began to construct such facilities at Berkley Yard. It had decided to replace its steam locomotives with diesel locomotives. The diesel locomotives required less frequent servicing than steam locomotives, so that by establishing Berkley Yard as a point for reporting and relief for certain of its crews the carrier could provide substantially continuous service in and out of Berkley Yard without the interruption which would be occasioned by having to send locomotives to Port Norfolk Yard for servicing and exchange of the crews.

The interested Brotherhoods, observing the construction of the facilities at Berkley Yard, on November 25, 1955, addressed a letter to the carrier in which they expressed their position that the carrier could not designate Berkley Yard as a point for reporting and relief of any of the crews except with the consent of the Brotherhoods or by new agreements, requiring the assent of the Brotherhoods.

At the request of the carrier, representatives of the Brotherhoods met with the President of the carrier on February 10, 1956, at which time they were handed a letter, in which he referred to the provisions of the contracts and stated the position of the carrier that, under the applicable agreements, the designation of points for reporting and relief would be governed by local conditions in the light of operating requirements as determined in the sole discretion of management, that there was no restriction upon the carrier's right to establish additional points for reporting and relief and the exercise of that right was not dependent upon the prior consent of the Brotherhoods or the initiation by the carrier of any procedure under the Railway Labor Act. Consistent with its position that the matter, under the agreements, was subject to unilateral determination by the carrier, it declined to negotiate with the Brotherhoods.

On February 13, 1956, the Brotherhoods responded to the carrier's position with a letter in which they acknowledged the right of the carrier to move the point for reporting and relief within a locality, but denied that the carrier had the right, without their consent, to establish a point for reporting and relief in a locality in which no such designated point had previously existed. They reiterated their position that the carrier could not designate Berkley Yard as such a point without the conclusion, in advance of the change, of a new or supplemental agreement.

On the same day, the Brotherhoods sent a telegram to the Mediation Board:

"Serious situation existing on Norfolk and Portsmouth Belt Line Railroad as the result of Management arbitrarily moving terminal from Port Norfolk to Berkley a distance of approximately six miles without negotiating with committees. Request your Board take immediate jurisdiction and notify carrier to hold matter status quo pending mediation proceedings. Letter follows."

By letter dated March 5, 1956, the Mediation Board declined to docket the application for mediation after observing that the terminal had not been moved from Port Norfolk to Berkley Yard though the carrier proposes to establish a new point for reporting and relief for certain of its crews.

On April 26, 1956, the carrier posted notices that effective May 2, 1956, Berkley Yard would be the designated point for reporting and relief for six of its thirty-four crews. It invited its employees to bid upon the jobs.[1]

The Brotherhoods promptly countered by advising the Mediation Board of a strike called to commence on May 2, 1956. Because of the "labor emergency" thus created, the Mediation Board proffered its services as it was authorized to do under Section 5, First of the Act, 45 U.S. C.A. § 155, First. The carrier agreed to maintain matters in *statu quo* during the mediation procedures which followed. Mediators conferred with the parties in Norfolk, and, subsequently, representatives of all parties were summoned to Washington where they conferred with a member of the Mediation Board. As a result of the efforts of the Mediation Board a number of proposals were made both by the carrier and by the Brotherhoods to settle the controversy. None of these proposals was acceptable, however.

The Mediation Board then addressed letters dated July 30, 1956, to the parties, in which it was stated:

"The Board directs the attention of the parties to the provisions of Section 3 of the Railway Labor Act, under which the National Railroad Adjustment Board was created with full authority to hear and decide on all disputes between carriers and employees growing out of grievances or interpretations or application of agreements concerning rates of pay, rules or working conditions.

"The National Mediation Board urges the parties to this dispute to either avail themselves promptly of the adjustment machinery of the Adjustment Board or to create, by agreement, a special or system board of adjustment under the provisions of Section 3, Second of the Act, to consider and decide upon the differences between them."

In response, the carrier advised the Mediation Board that its position always had been and still was that any

---

1. The carrier did not have divisional seniority lists. All of its employees of the same class, at whatever point they reported for duty, were carried on the same seniority list. Under the provisions of the applicable collective bargaining agreements each employee had the right to bid upon any job within his classification and new assignments were required to be posted for such bidding. Each job was awarded to the senior bidder. If there was no bid for a particular job, the carrier had the right, and was required, to assign the employee, within that classification, with the least seniority to the open job.

claims arising out of the designation of Berkley Yard as a new point for reporting and relief should be referred to the Railroad Adjustment Board. The Brotherhoods, however, advised the Mediation Board that they would not agree to refer the controversy to the Railroad Adjustment Board nor would they create by agreement a special or system board of adjustment under Section 3 of the Act, 45 U.S.C.A. § 153. Accordingly, under date of August 16, 1956, the Mediation Board addressed telegrams to the parties advising them that its efforts to mediate the dispute had been terminated.

On September 21, 1956, over thirty days after the Mediation Board had closed its file, the carrier posted a notice that effective September 26, 1956, five of its train crews would thenceforth report for duty and be relieved at Berkley Yard. Again the Brotherhoods countered, advising the carrier that a strike had been called to commence on the morning of September 26, 1956.

By virtue of the temporary injunction the strike was postponed, but Berkley Yard became the effective point for reporting and relief for five of the train crews on September 26, 1956.

Though the record clearly establishes that at least sixteen of the employees could report to Berkley Yard more conveniently and at less expense to themselves than at their previously designated points for reporting and relief, no employee bid upon the jobs at Berkley Yard. It is clear that the Brotherhoods and its members regarded the establishment of Berkley Yard as a point for reporting and relief as an unlawful change by the carrier in working conditions and it would appear that it was for that reason that no bids were received for these jobs. In consequence the jobs at Berkley Yard were filled by the carrier's assignment of employees of lowest seniority, without regard to their residences.

Thereafter the carrier submitted the controversy to the National Railroad Adjustment Board. That proceeding is now pending.

The historic difference between "major" and "minor" disputes, as those terms have long been known and understood in railroad labor controversies, is clearly delineated in the Railway Labor Act, and different procedures are provided for their determination.

■ "Major disputes," encompass those differences arising out of proposals for new contracts or of changes in existing contractual or legal obligations and relations. Since such differences cannot be composed by reference to existing agreements or obligations, but only by a new agreement, the Act provides procedural steps and machinery designed to encourage and facilitate agreement. The parties are required to negotiate (§ 2, Second, 45 U.S.C.A. § 152, Second), after which either party may invoke the services of the National Mediation Board (§ 5, First, 45 U.S.C.A. § 155, First). If the mediation procedures are unsuccessful, the Mediation Board must, as its "final required action," endeavor to obtain an agreement to submit the controversy to arbitration (§ 5, First, 45 U.S.C.A. § 155, First) and, if the dispute is still unsettled but threatens such interference with interstate commerce as to deprive any section of the country of essential transportation services, the Mediation Board is required to notify the President, who, in his discretion, is authorized to create an emergency board to investigate and report upon the dispute (§ 10, 45 U.S.C.A. § 160). As was said by Mr. Justice Rutledge, speaking for the Court in Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886, 1895:

"* * * Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5, First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the

dispute and no such power is intended, unless the parties themselves agree to arbitration."

■■ "Minor disputes," on the other hand, are grievances and other differences arising out of the application or interpretation of pre-existing agreements and obligations. Since their resolution is not dependent upon a new agreement of the parties, machinery is provided by which such disputes may be decided, if the parties themselves cannot settle their differences. Strikes, or other forms of self-help, are neither contemplated nor permissible. Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886; Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad Company, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Manion v. Kansas City Terminal Railway Company, 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed.2d 722. When minor disputes arise, the Act requires direct negotiation between the parties as the first procedural step (§ 2, Second, 45 U.S.C.A. § 152, Second). If a "labor emergency" is found to exist, the Mediation Board may proffer its services (§ 5, First, 45 U.S.C.A. § 155, First), but jurisdiction is conferred upon the National Railroad Adjustment Board (or, by agreement, special or system boards of adjustment) to determine the controversy. Unsettled "minor disputes" may be referred to the Adjustment Board by either party. An award, other than one of money, of the Adjustment Board is binding upon all of the parties. If there is noncompliance with an award, a suit may be maintained in an appropriate District Court where the award must be accepted as prima facie evidence of the facts and findings recited in it. (§ 3, First (i), (m), and (p), 45 U.S.C.A. § 153, First (i), (m), and (p).

The issue framed, negotiated and mediated by the parties here was a minor dispute, which, upon failure of the parties to agree, was referable to the National Railroad Adjustment Board for final determination. The Brotherhoods clearly stated their position in their letters of November 25, 1955, and February 13, 1956, that, under the existing agreements, the carrier could not establish Berkley Yard as a point for reporting and relief of any of its crews except with the consent of the Brotherhoods. They were standing upon the legal position that, in the absence of a new agreement requiring their assent, the establishment of a point for reporting and relief at Berkley Yard would constitute a violation by the carrier of § 2, Seventh, and § 6 of the Act (45 U.S.C.A. § 152, Seventh, § 156), which, for convenience, are set forth in the margin.[2] With equal clarity, the carrier in its letter of February 10, 1956, asserted its position that its proposed action was within its managerial prerogative as established in the existing agreements, which it had the unconditional and unilateral right to exercise. The existing agreements, according to the stated position of the Brother-

2. § 2, "Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

§ 6, "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

hoods, prohibited the action, while, in the carrier's view, they authorized it.

The learned District Judge in holding that, while the carrier had the right to designate Berkley Yard as an additional point for reporting and relief, the Brotherhoods had a concomitant right to insist upon prior negotiation and other procedures looking toward a new agreement covering what they anticipated as the resultant changes in working conditions, apparently, was of the view that the decision was one for joint determination in the first instance. That was the position of the Brotherhoods in the issue as framed, for they were insisting that a new or supplemental agreement was a precedent requisite to the effectuation of the change. It was not, however, the position of the carrier and the difference between the parties, which was the issue framed, related entirely to their contractual rights and obligations under the existing agreements.

To understand the nature of the controversy we should bear in mind the recognized distinctions between decisions of different nature and the means of effectuating them under collective bargaining agreements. The differences in the nature of the major classes of decision and the resultant differences in provisions for their resolution and effectuation are clearly pointed out in Regulation of Collective Bargaining By the National Labor Relations Board, by Archibald Cox and John T. Dunlop, 63 Harvard Law Review 389, 401. They are highlighted in the opinion of the Court in N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027.

A great majority of the collective bargaining agreements, by express provision or by implication, confer upon management the right and the power to make certain decisions without prior consultation with the representatives of the employees and to effectuate them in practice without the delay inherent in extended collective bargaining procedures. Among the decisions generally regarded as falling within this class are the type of product to be produced, the location of plants, the installation of new machinery and equipment and similar matters. All of such decisions when effectuated have a resultant effect upon working conditions and are of interest to employees and their representatives. They are none the less regarded as being within the prerogative of management alone to decide and effectuate in the first instance. Some collective bargaining agreements place in this category of decision many other matters, and it has been held that it is not an unfair labor practice for an employer to insist upon the inclusion in a collective bargaining agreement of a "management functions" clause of very broad scope. N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027. It has recently been held that a carrier's closure of a freight yard falls within this class of decision. Brotherhood of Railroad Trainmen v. New York Central Railroad Company, 6 Cir., 246 F.2d 114, affirming New York Central Railroad Company v. Brotherhood of Railroad Trainmen, D.C., 140 F.Supp. 273.

In the issue framed in this case, it clearly was the contention of the carrier that under the existing agreements the designation of a new point for reporting and relief was within this classification. It not only clearly so stated but it insistently refused to negotiate in advance regarding the change until the intervention of the Mediation Board. If the carrier was correct in this contention, its unilateral action would not constitute a violation of § 2, Seventh, or of § 6 of the Act for the prohibitions of those sections fall short of unilateral changes made in accordance with the terms of the applicable agreements and are limited to changes in those working conditions which are embodied in the agreement. See Williams v. Jacksonville Terminal Company, 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914; Order of Railway Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318.

There is a second class of decision which, under collective bargaining agree-

ments, can be resolved only by the joint determination of management and representatives of the employees. Included in this class of decision are those things ordinarily specifically covered in collective bargaining agreements. They include wages, hours of employment, seniority rights, grievance procedures, and similar matters.

If a matter falls within the second class of decision, under the Railway Labor Act and under the applicable agreements, the carrier can make no change without initiating negotiation by giving the notice required under Section 6 of the Act and participating in the subsequent procedures available in aid of settlement of a "major dispute." If at the conclusion of all of the required successive steps there is neither agreement between the parties upon the merits nor agreement to submit the controversy to arbitration, but only then, the carrier can effectuate the change and the Brotherhoods are free to strike.

There is yet a third major class of decision which is subject to determination solely by the representatives of the employees or the membership of those organizations, but we are not here concerned with that class of decision.

The generally recognized differences in the nature of the several classes of decision and the appropriate means of effectuating each are founded upon important considerations. The installation of new machinery, for instance, is a decision which management should be more qualified to make than the representatives of employees. The making of the decision and its effectuation, without delay, may be imperative if competitive conditions are to be met and the interest of both employer and employees are to be

served in the long run. That the employees have no right to participate in the making of such decisions, or to condition their effectuation upon prior negotiation and other procedural steps looking toward new contractual rights and obligations, does not mean that the employees and their representatives are without rights. After the effectuation of such decisions of management, the employees and their representatives are free to take such action, within the confines of existing agreements, as they may feel appropriate in the light of the changed situation.

■ Here then, the carrier was clearly contending that the establishment of Berkley Yard as an additional point for reporting and relief was a decision within the first category. It founded its argument upon the terms of the existing agreements and insisted that it would not negotiate with the Brotherhoods prior to the accomplishment of the change.

On the other hand, the Brotherhoods were insisting that the decision was one within the second class mentioned above, which could be effected only after resort to the appropriate collective bargaining procedures provided in aid of settlement of proposals for a new or supplemental agreement.[3]

The controversy thus was centered upon the nature of the decision. The difference was whether, under the existing agreements, it was within the exclusive power of management, acting unilaterally, to make and effectuate the change or whether effectuation of the change might be conditioned by the Brotherhoods upon negotiation and other procedures looking toward a new or supplemental agreement. Since it thus arose out of a difference of opinion as to the

---

3. The District Court seemed to find it material that the Brotherhoods after recording their position that the change could not be made without their assent, subsequently stated that it could be done only after the negotiation of a new agreement to take care of anticipated hardship. The difference is not substantial, however, for in either event the essence of the position of the Brotherhoods was that the decision fell within Class 2 and could not be effectuated by the carrier except by the carrier's invocation of all of the procedures provided in aid of settlement of a "major dispute," and if these did not result in an agreement upon the merits or an agreement to arbitrate, the Brotherhoods would have the right to strike, all in advance of the effectuation of the decision.

interpretation or application of the existing agreements, it was a "minor dispute" subject to final determination by the National Railroad Adjustment Board. Evidently for that reason, the Mediation Board refused to docket the case upon the application of the Brotherhoods, though when it later found that a labor emergency existed it proffered its services, but, in terminating its efforts, referred the parties to the jurisdiction of the Adjustment Board.

We are not concerned with the merits of that controversy. Whether the carrier was correct in its interpretation of the agreements as giving it the right to accomplish the change without prior agreement or negotiation, as the Brotherhoods in this Court apparently concede or whether the Brotherhoods were correct in their original position that they had the right, under the agreements, to insist that the carrier take the initiative in processing a "major dispute" as a condition precedent to the change can be determined only by the Railroad Adjustment Board. Our task is only to discover the nature of the issue as framed and defined by the parties and the treatment subsequently accorded it by the parties and the Mediation Board.[4]

Since the dispute is a minor one subject to final determination by the Adjustment Board, to which it has been submitted by petition of the carrier, the threatened strike should be enjoined. Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad Company, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Manion v. Kansas City Railway Company, 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed.2d 722.

■ The Brotherhoods contend, however, that, at some point in the proceedings, they changed their position. They now concede that the carrier was correct in its position on the issue framed by the letters and that it, "in the exercise of

its managerial prerogative, and without regard to the wishes of the Brotherhoods, has the inherent right as management to change the designated point of reporting and relief." In the testimony, witnesses for the Brotherhoods made the same concession stating additionally, that they had not sought to negotiate, as such, the question of the right of the carrier to make the change but had sought a new "agreement to cover the hardship and expense imposed on the men by this change." They conclude that, having gone through the steps of negotiation and mediation in an effort to obtain a new agreement (a "major dispute"), they are now free to strike in aid of their demands.

This belated concession of the correctness of the legal position of the carrier, however, did not come earlier than the hearing on the merits in this case, long after all negotiation and mediation had terminated. In their answer in this case, the Brotherhoods alleged that the change to Berkley Yard as the point for reporting and relief of some of the crews "does constitute a change in working conditions within the meaning of Section 2, Article 7, of the Railway Labor Act requiring the complainant to give the defendants notice of such change pursuant to Section 6 of the Railway Labor Act, and requiring negotiations by complainant and defendants to establish working conditions applicable to such change." They further allege that the letters of November 25, 1955, and February 13, 1956, which framed the issue as a "minor" one, evidenced their "repeatedly announced position." Moreover, their earlier position as to the legal rights of the parties was implicit in their telegram of February 13, 1956, to the Mediation Board in which they referred to the "serious situation * * * as the result of management arbitrarily moving terminal * * *." The Mediation Board, itself, apparently so regarded it, for had it been recognized

4. There is nothing to indicate that either party was insincere in the assertion of the conflicting interpretations of their

rights and obligations. Nor was the carrier's position founded upon such insubstantial grounds as to amount to an ap-

as a "major dispute" arising out of new contract proposals by the Brotherhoods, the Mediation Board would not have declined to docket the case upon the application of the Brotherhoods nor, in terminating its efforts, would it have urged the submission of the controversy to the Railroad Adjustment Board or the creation of a special board of adjustment.

The District Judge excluded evidence of the details of the proposals made by the parties during the stage of mediation, but the record contains abundant evidence that they were concerned with free transportation and travel time pay for employees, residing in Portsmouth, who would report for duty and be relieved at Berkley Yard. The subject of the proposals, however, does not define the issue or establish the nature of the dispute. If the "minor" issue, as framed, was to be negotiated and mediated, the successive proposals would not take the form of endless argument of the conflicting legal positions of the parties, but that of practical compromise. The legal differences as to the unilateral right, under the existing agreements, of the carrier to establish Berkley Yard as an additional point for reporting and relief could be finally determined only by the Railroad Adjustment Board. Any compromise necessarily would concede something to the demands of the Brotherhoods that their consent to the establishment of Berkley Yard as an additional point for reporting and relief must be purchased by payment of travel time and free transportation to and from Port Norfolk Yard and Berkley Yard.[5]

The subject matter of the proposals during negotiation and mediation adds no support to the contention of the Brotherhoods that a new rule was proposed, negotiated and mediated. On the contrary, the refusal of the Brotherhoods to accept the change, without concessions acceptable to them, suggests firm adherence to their stated view that the carrier could not lawfully make the change without their consent, a position they reiterated in their answer in this case.

If the present concession of the Brotherhoods was manifested earlier than the hearing on the merits in this case, they would have accepted, not opposed, the proposed change in the point of reporting and relief for some 25 to 30 of the 172 employees involved, reserving the right to propose such rule changes as seemed appropriate. Indeed, their very insistence, upon a previously negotiated new rule emphasized their stated position that the controversy was one of denial of the contractual right of the carrier to effectuate the proposed change. The record conclusively establishes that the change would be very advantageous to 16 of the 25 to 30 employees involved. Since Berkley Yard is located immediately across the Southern Branch of the Elizabeth River from Portsmouth and since Port Norfolk Yard is in the northern portion of Portsmouth, it is by no means certain that Berkley Yard is less accessible to all residents of Portsmouth than is Port Norfolk Yard. The distance between the two yards by the most direct route (toll tunnel) is 4½ miles, but Berkley Yard is closer and possibly more accessible to some areas of Portsmouth than is Port Norfolk Yard. Only by acceptance of the proposed change and permission of its members to freely bid on the Berkley Yard jobs in accordance with the existing agreements and seniority rules could it be determined what, if any, hardship might be imposed upon residents of Portsmouth by the change.

Under such circumstances, if the Brotherhoods had regarded their legal position to be what they now concede, they should have awaited the event, accepting the change as the admitted right of the carrier, and, after ascertaining

parent attempt to circumvent the prohibitions of § 2, Seventh, and § 6 of the Act.

5. The demands of the Brotherhoods apparently would apply to those residents of Portsmouth who, on their own time and at their own expense, had been travelling the much longer and costlier route to report at Sewells Point Yard. If operations were to be continuous at Berkley Yard, travel time pay would likely be at premium rates.

what hardship ensued, proposed such rule changes as they felt appropriate. Brotherhood of Railroad Trainmen v. New York Central Railroad Company, 6 Cir., 246 F.2d 114, affirming New York Central Railroad Company v. Brotherhood of Railroad Trainmen, D.C., 140 F.Supp. 273.

The New York Central case is strikingly similar to the one here. There the New York Central proposed to close its North Toledo Yard. It acted upon the assumption, which the court found to be correct, that, under the existing agreements it had the absolute right to do so. That right was challenged by the Brotherhoods who took the position that the yard could not be closed until a new agreement, covering all of the anticipated problems and hardships involved in the reassignment of employees, had been concluded and that § 6 of the Act cast the burden upon the carrier to initiate negotiations looking toward such an agreement. When the controversy developed into a "labor emergency" the Mediation Board proffered its services, which were accepted, and extended efforts to mediate and compromise the controversy followed. They were not successful and the Mediation Board closed its file. The Brotherhoods gave notice of a strike, and the court issued an injunction. Upholding the legal right of the carrier to close the yard, the court held that anticipated hardship in the reassignment of employees was a "separate and distinct problem that may be met when the time arrives," but was not presently a labor dispute upon which a strike might lawfully be founded.

Bargaining for compensation for anticipated hardships which may never be incurred and the extent of which is unknown is difficult at best. When further complicated by the fact that the primary issue was the conflict in the legal postulates of the parties, it is not surprising that agreement could not be reached.[6] Certainly, the failure of agreement under those conditions does not suggest that, if special hardship does result from the change to Berkley Yard, appropriate agreements cannot be concluded.

If "the moral force of public opinion (is the) ultimate sanction" of the Act in the disposition of "major disputes," it is incumbent upon the parties to submit themselves to the successive procedures of the Act before resorting to self-help. Virginian Railway Company v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. These procedures are ordinarily initiated by giving the notice of proposed changes in agreements required by Section 6 of the Act (45 U.S.C.A. § 156). The Brotherhoods did not comply with Section 6. Nor can we say that the carrier waived the requirements of that Section when it subsequently participated in mediation, for the issue framed was a "minor" one to which Section 6 is inapplicable. Indeed it was handled as such, and all of the mandatory procedures in aid of settlement of "major disputes" have not been completed.

If by a tardy change in its legal position, a party could convert a "minor dispute" processed through the procedures applicable only to those disputes, into a "major dispute" fully processed, the mandatory provisions of the Act in aid of settlement of "major disputes" would be circumvented and the public denied those safeguards against interruptions

---

**6.** The negotiation required by the Act is the same "good faith" bargaining required by the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. Brotherhood of Railway Trainmen v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534. Under the latter act bargaining from a legally erroneous premise may be held an unfair labor practice. Taylor Forge & Pipe Works v. N. L. R. B., 7 Cir., 234 F. 227.

See also, N. L. R. B. v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027; N. L. R. B. v. Darlington Veneer Company, 4 Cir., 236 F.2d 85. It may be that, without questioning the sincerity of their conviction of their legal rights, which they apparently now concede to have been erroneous, the bargaining did not satisfy the substantive requirement of negotiation imposed upon the Brotherhoods by the Act.

**46**

of service, the establishment of which was the major purpose of the Act. The concession of the Brotherhoods to the legal position of the carrier upon the "minor issue" may have made moot the pending proceeding before the Adjustment Board, but it cannot leave them free to strike in aid of proposed contract changes when they have not fully processed any such proposal as a "major dispute" under the required procedures of the Act.

Since the issue framed and processed by the parties was a "minor" one, resort by the Brotherhoods to a strike was not lawful and a permanent injunction should be entered. The injunction will be without prejudice to the right of any party to process, under applicable provisions of the Act, any dispute which, properly framed, may arise out of the factual situation, or to apply to the District Court for such further orders as may be appropriate in the light of this opinion.

Reversed and remanded.