UNITED TRANSPORTATION UNION, LODGE NO. 621, Plaintiff-Appellee,

v.

ILLINOIS TERMINAL RAILROAD COMPANY, Defendant-Appellant.

No. 72–1093.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1972.

Decided Dec. 8, 1972.

**376**

Ralph J. Swanson, Danville, Ill., George E. Lee, St. Louis, Mo., for defendant-appellant.

F. Daniel Welsch, Danville, Ill., Phillip J. Kardis, Paul L. Pratt, E. Alton, Ill., for plaintiff-appellee.

Before STEVENS and SPRECHER, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

SPRECHER, Circuit Judge.

This appeal involves the right of a railroad union to preserve the *status quo* until the several steps in the "major dispute" provisions of the Railway Labor Act are exhausted, in the face of the railroad's contention that only a "minor dispute" is involved.

## I

The Railway Labor Act, 45 U.S.C. §§ 151–88, was designed to avoid interruption in the flow of interstate commerce by providing procedures for the prompt and orderly settlement of disputes between common carriers and their employees. The Act prescribes entirely different procedures for the settlement of a "major dispute,"[1] arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions, and for the settlement of a "minor dispute,"[2] arising out of the interpretation or application of collective agreements. Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 722–727, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). In a major dispute, the Act imposes upon the parties an obligation to refrain from altering the *status quo* by resorting to self-help while the Act's "almost interminable process" is being exhausted (Detroit & Toledo Shore Line Railroad Co. v.

---

[*] Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. In "major disputes" both parties are required to give at least 30 days written notice of an intended change in agreements affecting rates of pay, rules, or working conditions (§ 156). The parties must confer and attempt to resolve the disputed issues (§ 152, 2nd). Thereafter either party may invoke the mediatory services of the National Mediation Board, which is required to "use its best efforts" to effect an amicable settlement (§ 155, 1st.). When the NMB determines that it has failed, it endeavors to induce the parties to submit their controversy to arbitration and if this is unsuccessful, the NMB notifies the parties of the failure of its mediatory efforts (§§ 155, 1st, 157). Where the dispute threatens "substantially to interrupt interstate commerce . . . such as to deprive any section of the country of essential transportation service," the NMB may notify the President who may, in his discretion, create an emergency board to investigate the dispute and make a report of its findings to him (§ 160). Throughout these proceedings and for 30 days after the NMB has notified the parties of its mediatory failure, or, where applicable, the emergency board has made a report to the President, neither party may alter the *status quo*. (§§ 155, 1st, 156, 160). See Harper, "Major Disputes Under the Railway Labor Act," 35 J.Air L. & Com. 3 (1969).

2. In "minor disputes" the disputed issues are referred to an Adjustment Board whose interpretation of the collective agreement is binding on the parties (§ 153). See Kroner, "Minor Disputes Under the Railway Labor Act: A Critical Appraisal," 37 N.Y.U.L.Rev. 41 (1962).

United Transportation Union, 396 U.S. 142, 149, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969)), whereas in a minor dispute the Act is silent as to any obligation to maintain the *status quo*.

The threshold question, whether the dispute is major or minor, requires a brief review of the facts.

## II

The defendant railroad is a line-haul Class I freight-carrying railroad with its principal office in St. Louis, Missouri, and maintaining 359 miles of main line track. Industrial areas in St. Louis and in portions of Illinois embraced within a circle outlined by Madison, Granite City, Alton, Roxana, Wood River and Edwardsville constitute an industrial complex for which switching and transfer service is provided by a division of the railroad known as the Diesel Division.[3] The plaintiff union represents employees who work as trainmen (brakemen and conductors) solely within the Diesel Division.

The railroad for many years maintained on its Diesel Division two "on and off" duty points or "home terminals" known as "Federal Yard," located in Alton, Illinois, and "McKinley Junction," located in Madison, Illinois. However, sometime prior to March, 1971, the railroad by agreement with Shell Oil Company took over from Penn-Central Railroad the switching operation at Shell's Wood River Plant.

On March 29, 1971, the union served upon the railroad a "Section Six Notice" (major dispute) that "no assignment shall commence or go on duty at any starting point other than Federal (Alton) or McKinley Junction (Madison) except by a negotiated agreement whereby the Conductor or Foreman shall re-

ceive 'Footboard Master' rate of pay and all members of the crew shall receive one (1) hour arbitrary pay for starting at other than the two (2) above mentioned Terminals."[4] Several conferences and negotiations regarding the notice took place between representatives of the railroad and the union.

Approximately five months thereafter, on August 23, 1971, the railroad posted a bulletin at Federal Yard and McKinley Junction, making two new job assignments with "on and off" duty points "at the South Main Gate of Shell Oil Company Refinery." Both job assignments were to and did begin on September 1, 1971.

On August 30, 1971, the union commenced this action praying, inter alia, that the *status quo* between the parties be maintained until the major dispute provisions of the Railway Labor Act were exhausted. On November 30, 1971, the district court granted the union's motion for a preliminary injunction and the railroad appealed.

## III

In the first place, it is pertinent to note that the Union's Section 6 notice was given almost five months prior to the railroad's unilateral attempt to effect new assignments. Section 6 expressly requires that "[*in*] *every case where such* . . . [Section 6 notice] *has been given*, or conferences are being held with reference thereto . . . rates of pay, rules, or *working conditions shall not be altered* by the carrier until the controversy has been finally acted upon . . . by the Mediation Board . . . ." (emphasis added).

The railroad argues that the seemingly mandatory language of Section 6 would permit a union to determine

---

3. The balance of the operations include line-haul operations from Edwardsville through Springfield to East Peoria and a line from Springfield through Decatur and Champaign, Illinois, all known as the Electric Division because it was originally an electric interurban passenger operation.

4. There is a distance of 33 miles between Federal Yard and McKinley junction, 6 miles between Federal Yard and the Shell plant, and 27 miles between McKinley junction and the Shell plant.

which disputes were major ones by the simple filing of a Section 6 notice, whereas courts have held that it is the substance of the controversy rather than the parties' characterization of it which controls the major-minor dichotomy, citing Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 33 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963); Hilbert v. Pennsylvania R. R., 290 F.2d 881, 885 (7th Cir.), cert. denied, 368 U. S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961); and Norfolk & Portsmouth Belt Line R. R. v. Brotherhood of R. R. Trainmen, 248 F.2d 34, 43 (4th Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L. Ed.2d 274 (1958).

The consequence of the union's giving of the Section 6 notice prior to the railroad's new assignment bulletin would seem, in view of the mandatory language of Section 6, to be somewhat as described by a commentator:

"Where there is a pre-existing major dispute pending between the parties, the courts have examined the section 6 notice filed by either party to determine whether the particular point in controversy was covered. This has generally been construed as a question of fact, that is, whether the carrier's action is on a subject being bargained on pursuant to the notice or whether the particular charge is not covered by the notice. However, where no section 6 notice has been filed, or the court determined that the dispute is not covered by the notice, the courts' examination has seemed to take a different tack. Since, in these cases there is no notice which can be examined, or there has already been a determination that the subject is not covered by the

notice, the courts seemingly resort to characterization of the dispute . . . ."[5]

In both the *Rutland* and *Hilbert* cases, the railroad had first filed the same Section 6 notice proposing a general revision of all collective bargaining agreements. In *Rutland*, the subsequent bulletin purported to reduce the number of freight runs, thereby decreasing the number of jobs and changing some home terminals. In concluding that the dispute was minor, the court observed that "the language in the Rutland's [section 6] notices was not necessarily inconsistent with the railroad's present contention that it has the right under its existing agreements to change train schedules without negotiation."[6] In *Hilbert*, we affirmed the trial court's determination that a minor dispute was involved, saying that "[w]e agree with the District Court that the section 6 notice of November 2, 1959 is not involved in this case",[7] where the railroad exercised unilateral authority to transfer crews between established terminals.

In the *Norfolk* case, the court held that the railroad's establishing of an additional point for reporting was a minor dispute. The unions involved conceded that they had originally treated the dispute as a minor one and that after the proceedings were well under way they changed their position. The court found that the unions had not complied with Section 6 and that they were bound by having treated the dispute as a minor one.[8]

This case is readily distinguished from *Rutland, Hilbert* and *Norfolk*. Here the earlier given Section 6 notice explicitly related to the issue that "no assignment shall commence or go on duty at any

---

5. Harper, *supra*, n. 1, at 16–17.

6. Rutland Ry. v. Brotherhood of Locomotive Engineers, *supra*, 307 F.2d at 34. The court also noted that "[t]he court below found that in general there had been no negotiation in the past between the Rutland and its employees over changes in train runs." *Id.* at 35.

7. Hilbert v. Pennsylvania R. R., *supra*, 290 F.2d at 885.

8. Norfolk & Portsmouth Belt Line R. R. v. Brotherhood of R. R. Trainmen, *supra*, 248 F.2d at 45.

starting point other than Federal (Alton) or McKinley Junction (Madison)," whereas the later bulletin required that the "Shell Oil Jobs Will Begin Work at the South Main Gate of Shell Oil Company Refinery." The district court found that "[t]here were conferences or negotiations concerning the [Section 6] notice on several occasions between the General Chairman of the Union and the Manager of Labor Relations and Personnel." Negotiations under Section 6 had commenced on the very subject to which the unilateral bulletin later pertained. Unlike *Rutland, Hilbert* and *Norfolk,* the kind of dispute here involved was characterized and treated by both parties as a major dispute before the specific bulletin was posted. The district court so found and held. In order for us to consider his findings and conclusions clearly erroneous, it would be necessary for us to conclude that the dispute was a minor one as a matter of law.

### IV

The Supreme Court opinion in Detroit & Toledo Shore Line R. R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), establishes that the kind of dispute here involved is not a minor dispute as a matter of law, although as shown by the cases discussed above it may be one as a matter of fact in any particular situation.

The facts in *Shore Line* are remarkably similar to the facts in the present case. And if those facts had constituted a minor dispute as a matter of law, the Supreme Court would have been constrained to reverse the lower courts.

For many years all Shore Line train crews reported for work at Lang Yard in Toledo, Ohio, and the railroad assumed the costs of transportation and overtime for crew members assigned to other points. In 1961, the railroad announced its intention of establishing outlying work assignments at Trenton, Michigan, about 35 miles north of Lang Yard. The union filed a Section 6 notice. While the issue was proceeding as a major dispute, the railroad abandoned the Trenton

assignments and instead announced a new assignment at Dearoad Yard near Detroit, which was 50 miles north of Lang Yard. The union withdrew from the pending proceedings and proceeded before a special board of adjustment as a minor dispute. The special board held that the railroad could unilaterally make the Dearoad assignments, which incidentally were at the railroad's northern end of the line (Lang Yard being at the southern end).

Heartened by the board ruling regarding Dearoad Yard, the railroad renewed its Trenton assignments and the union again filed a Section 6 notice. The district court granted an injunction restraining the railroad from establishing any new assignments at Trenton or anywhere else on the ground that the *status quo* provision of Section 6 forbids a carrier from taking any unilateral action altering "rates of pay, rules, or working conditions" while a dispute is pending.

The district court in the present case concluded that the *Shore Line* case "is inescapably precedent for the case at bar." The railroad seeks to distinguish the *Shore Line* case on several grounds, the principal one being that the parties in *Shore Line* conceded that the dispute was a major one and that therefore the Supreme Court did not expressly pass on the major-minor question.

At the outset it should be noted that the Railway Labor Act does not use the terms "major dispute" or "minor dispute." These are merely shorthand terms adopted by the courts to distinguish Section 3 disputes where the railroad acts unilaterally and a union protest is finally decided by an adjustment board, from Section 6 disputes where a lengthy process of negotiation, mediation, voluntary arbitration and conciliation is undergone while the *status quo* is maintained.

In *Shore Line,* as here, the collective agreement was silent as to starting points and did not preclude the railroad from altering the location of work assignments. The railroad argued that it

could, therefore, make unilateral work assignments without invoking the *status quo* provisions of Section 6. Whatever semantics are used, the fact is that the railroad in *Shore Line* was making the identical argument that the railroad is making here under identical facts. If the railroad here takes the position that under the *Shore Line* circumstances the parties had conceded that a major dispute existed, then it must follow that a major dispute is equally conceded here. If the *Shore Line* decision includes the implicit finding that a major dispute existed, as we believe it does, then it cannot be argued that as a matter of law a minor dispute exists here.

V

Finally, the railroad argues that there existed a past history or practice of the railroad making unilateral work assignments. In *Shore Line,* the Court said at 396 U.S. 153–154, 90 S.Ct. at 301:

"Thus, the mere fact that the collective agreement before us does not expressly prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, such assignments had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions."

The railroad here presented evidence of previous changes in work assignments but there was also evidence that the union disputed those changes. The district court found that there was not sufficient "acquiescence of the employees" in the previous changes to cause them to rise to an established practice. See United Transportation Union, Local Lodge No. 31 v. St. Paul Union Depot Co., 434 F.2d 220 (8th Cir. 1970), cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). We cannot say that the court's finding in this regard was clearly erroneous.

The judgment of the district court is affirmed.

Affirmed.

STEVENS, Circuit Judge (concurring).

In my opinion neither the timing of the union's § 6 notice nor the fact that this dispute involves the same subject matter as the dispute in *Shore Line* is of critical importance. Instead, the controlling consideration is the fact that neither party makes a substantial claim that its position is justified by the existing contract.

In the dispute arising out of the transfer of the St. Louis terminal to Lang in 1955, the union contended that the move was *prohibited* by the contract. As I understand the record, the railroad did not argue that the move was *authorized* by contract; it took the position, which the Board accepted, that the dispute was outside the coverage of the contract. Under the parties' understanding of the law prior to *Shore Line,* it followed that the unilateral change in working conditions was therefore permissible.

The same analysis explains Judge Regan's disposition of the dispute arising out of the designation of the A. O. Smith plant as a new assignment point in 1966. Again the union affirmatively relied on the contract and, I believe, correctly stated that the company took "the position that the designation of home terminals, points of assignment and on-duty location points *is not a matter of present existing agreement.* . . ."[1] Since the union's position rested entirely on an interpretation of the existing contract as prohibiting the new assignment, Judge Regan properly held that the dispute was minor notwithstanding the service of a § 6 notice.

[1]. App. 142. (Emphasis added.) The quotation is from the union's § 6 notice dated March 4, 1966. The railroad did not object to this characterization of its position. Prior to the *Shore Line* deci-
sion in 1969, the railroad appears to have consistently urged that the designation of new assignment points was not covered by existing agreement.

Not until after *Shore Line,* as I read the record, did the railroad ever argue that its right to designate new assignment points was affirmatively authorized by the existing contract. It is true that it now argues that Article 9 impliedly includes such authorization, but I find no substance to that contractual defense.[2] The express language of the agreement does not support it,[3] and the past practice, when properly analyzed, demonstrates that the railroad for many years consistently and affirmatively contended that this kind of dispute was *not* covered by the contract.[4]

Since the union's formal notice of March 29, 1971, did not rely on the contract, but rather initiated negotiations for an agreement on a subject not then covered by contract, the dispute which ensued was major. See Elgin J. & E. Railway Co. v. Burley, 325 U.S. 711, 722–723, 65 S.Ct. 1282, 89 L.Ed.2d 1886.

2. *Cf.* Airlines Stewards & Stewardesses Assn., Local 550 v. Carribbean Atlantic Airlines, Inc., 412 F.2d 289, 291 (1st Cir. 1969).

3. Article 9 merely provides: "Payment of yardmen shall continue until they return to the point of their assignment." The written agreement is completely silent on the question of designating starting points although other provisions in the contract make it clear that Federal and McKinley Junction are recognized assignment points.

4. Of course, if the contract authorized the railroad to designate a new assignment point, the union would still have the right to initiate a § 6 proceeding by requesting a change in that contract provision. On that hypothesis, however, the "working condition" which could not be altered during the pendency of the § 6 proceeding would be the railroad's contractual right to change starting points, rather than the particular starting points which happened to be in use at the time.