**R. DEMENT; J.H. Hines; V.N. Meekins; L.A. Koenig, Plaintiffs–Appellants,**

**v.**

**RICHMOND, FREDERICKSBURG & POTOMAC RAILROAD COMPANY; United Transportation Union, Defendants–Appellees.**

**No. 87–2069.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1987.

Decided April 26, 1988.

---

Robert Patrick Geary, Richmond, Va., for plaintiffs-appellants.

William Francis Sheehan (Shea & Gardner, Washington, D.C., James V. Meath, Williams, Mullin, Christian & Dobbins, on brief), Jay J. Levit (Levit & Mann, Richmond, Va., Clinton J. Miller, III, Asst. Gen. Counsel United Transp. Union, Washington, D.C., on brief), for defendants-appellees.

Before WINTER, Chief Judge, HALL, Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

FRANK A. KAUFMAN, Senior District Judge, sitting by designation:

Appellants, four railroad workers, appeal from the district court's dismissal of their so-called "hybrid" action against their union, the United Transportation Union (UTU), and their employer, the Richmond, Fredericksburg & Potomac Railroad Company (RF & P). We affirm the dismissal of two of appellants' three claims against the UTU, but remand the third claim for further proceedings. We also affirm the dismissal of the appellants' action against the RF & P, but for reasons different from those stated by the district court.

## I.

Appellants R. Dement, J.H. Hines, Jr., V.N. Meekins and L.A. Koenig (hereinafter collectively "appellants") are employees of the former Seaboard Coast Line Railroad Company (Seaboard).[1] On November 12, 1986, they filed suit in the United States District Court for the Eastern District of Virginia against their union, the UTU, for breach of the latter's statutory duty of fair representation imposed upon it by the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1982). *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Also joined as a defendant in the suit is the RF & P, which, appellants allege, violated its collective bargaining agreement with the UTU. If appellants are given the benefit of all reasonable inferences, the facts as alleged are as follows:[2]

In 1970, in connection with Seaboard's merger with another railroad,[3] Seaboard and the RF & P agreed to consolidate railroad yard operations which, up until that time, were performed in both Seaboard's Hermitage Yard in Richmond and the RF & P's Acca Yard, also in Richmond. Under the terms of the 1970 agreement (Consolidation Agreement), Seaboard discontinued

---

1. According to the record, Seaboard has changed its name to the CSX Transportation Company. That name change is immaterial to this appeal, and we refer in this opinion to Seaboard by its former name.

2. The district court granted the UTU's motion to dismiss under Fed.R.Civ.P. 12(b)(6). However, because the record contains certain documents other than the pleadings, the motion to dismiss was converted into a motion for summary judgment, *see Gay v. Wall,* 761 F.2d 175, 177 (4th Cir.1985), and we shall treat it as such. None of the parties is prejudiced by that conversion, since both the motion to dismiss and the nonmoving parties' opposition to it were styled in the alternative as summary judgment motions, and all parties submitted appropriate Fed.R. Civ.P. 56 documentation.

3. Certain documents in the record term the merger the "Seaboard [Air Line]–Coast Line" merger. The record does not indicate whether Seaboard also merged in any way with the RF & P.

its operations then performed at the Hermitage Yard and transferred them to the Acca Yard. The Consolidation Agreement gave to Seaboard employees, who had previously worked at the Hermitage Yard, the right to bid on and fill similar positions at the Acca Yard. Whenever the Seaboard employees worked at the Acca Yard under that arrangement, their employment was governed by whatever collective bargaining agreements the RF & P had negotiated with its UTU local, and that same UTU local also represented the Seaboard employees with respect to grievances arising out of their work at the Acca Yard. The Consolidation Agreement also permitted these Seaboard employees to retain the right to bid on jobs at Seaboard facilities other than the defunct Hermitage Yard. When Seaboard employees worked at Seaboard's other facilities, they were subject to the applicable bargaining agreement between Seaboard and its UTU local, and that local represented the employees with respect to grievances against Seaboard.

In 1979, the RF & P and RF & P's UTU local negotiated a new agreement, the "Crew Consist Agreement," the terms of which, appellants charge, violated the protections afforded appellants under the Consolidation Agreement. Essentially, the Crew Consist Agreement allowed the RF & P to reduce the size of the train crews which worked in the Acca Yard. In exchange for that reduction, the RF & P agreed to pay those employees who worked as members of the smaller train crews additional pay to serve "as compensation for the additional services and responsibilities consistent with the operation of a reduced crew." Crew Consist Agreement, ¶ 3. The Crew Consist Agreement, however, limited the class of employees who were entitled to the extra pay to two groups. The first group consisted of so-called "protected employees," *i.e.*, "all employees initially hired by RF & P and holding seniority on the combined road/yard roster as of [April 1, 1979]." Crew Consist Agreement, ¶ 2. The second group was comprised of all

workers employed after April 1, 1979. Crew Consist Agreement, ¶ 3. Because appellants were not initially hired by the RF & P, they were not treated as "protected employees." Furthermore, because appellants were hired prior to April 1, 1979, they also failed to come within the second group of employees covered by the Crew Consist Agreement.

According to appellants, they did not become aware of the terms of the Crew Consist Agreement until February 1982. At that time, appellant Koenig, who was then working on a reduced crew at the Acca Yard, sought, but was denied, the additional payments made to "protected employees" under the Crew Consist Agreement. The denial of Koenig's payments precipitated a four-year struggle between the UTU, the RF & P, and the Seaboard employees excluded from coverage of the Crew Consist Agreement. The battle was waged on two fronts, between the Seaboard employees and the RF & P, and also between the Seaboard employees and their own union. In March 1983 appellant Dement, the Chairman of Seaboard's UTU local, requested that the RF & P's management rescind the Crew Consist Agreement. The RF & P, however, refused to deal with Dement, claiming that only members of the RF & P's UTU local were authorized to handle the RF & P employee grievances in question.

Most of appellants' attempts to resolve their contractual differences, however, occurred within the UTU hierarchy itself. From January 1983 until the spring of 1984, appellant Dement was in touch with various UTU officials, including UTU President Fred Hardin, seeking their help in amending the Crew Consist Agreement so as to include the Seaboard employees. Although the UTU allegedly promised to investigate the matter and certain meetings were held,[4] Dement's efforts were apparently unsuccessful. The existing record suggests that the union officials may have

---

**4.** The scanty record, which consists largely of several letters written by Dement in 1984 and 1986, indicates that while some meetings were

held during this time period, others, although scheduled, were later cancelled.

been less than solicitous of the concerns of the Seaboard employees.[5]

Finally, on June 1, 1984, an arbitration board known as the "Public Law Board" (Board) constituted pursuant to the RLA, *see* 45 U.S.C. § 153,[6] adjudicated appellant Koenig's claim that the denial of payments to him in 1982 was incorrect. In a two-to-one decision,[7] the Board rejected Koenig's claim, reasoning in relevant part as follows:

The [UTU] bases its claim on the fact that the [Seaboard] Employees working on the RF & P are performing additional services for the latter Carrier but are not receiving payment.

The Claimant [Koenig] is not a "protected Employee" because he was not initially hired by RF & P, which is a requirement of the Agreement in question. Nor was he hired subsequent to April 1, 1979. This Claimant was, of course, initially hired by [Seaboard].

This Board has no authority or jurisdiction to extend the terms of Agreements between the two parties to individuals who were clearly not covered by the terms of the Agreement. Accordingly, we have no alternative but to deny the claim.

The Board's ruling was limited to an interpretation of the Crew Consist Agreement. Koenig did not raise, nor did the Board address, the question of whether the terms of that agreement violated the 1970 Consolidation Agreement.

A little over one month after the Board's determination, appellant Dement, acting on behalf of the Seaboard employees, wrote to UTU President Hardin. Dement informed Hardin that he intended to retain an attorney and sue both the UTU and the RF & P over the Crew Consist Agreement. In that letter, in discussing why he would bring suit at that time, Dement stated his interpretation of the UTU Constitution:

According to Article 28 of the U.T.U. [sic] Constitution, I am not allowed to seek self help in the form of a civil law suit until all avenues of appeals have been exhausted. It is my understanding that the ruling [of the Board on Koenig's claim] ... constitutes the end of all appeals.[8]

About a week later, President Hardin replied to Dement's letter, declining to take any action in connection with the contractual dispute until he received appropriate comments from the UTU General Chairman, R.E. Thompson. Commenting with regard to Dement's understanding of the UTU Constitution, Hardin rather cryptically wrote: "The decisions by Public Law Boards are final and binding on both parties."

On August 1, 1984, Dement answered both Hardin's letter and one received from R.E. Thompson as well.[9] Dement's August 1st letter stated his understanding that the Board's denial of Koenig's claim was the end of the UTU's internal grievance procedures, and that Dement was entitled to bring a civil suit with respect to claims arising under the Crew Consist Agreement. Dement's letter also reflected that as of August 1, 1984, the Seaboard employees were extremely dissatisfied with the union's handling of the Crew Consist Agreement grievance:

I have not talked with an attorney yet, since I feel I must await your decision. However, my [union] local ..., in anticipation, passed a motion over a year ago that I should do so, since this ruling was expected. I cannot accurately express

---

5. Most of the details in that regard can be found in a long letter Dement wrote to President Hardin on July 5, 1984. The letter traces the history of appellants' efforts to amend the agreement.

6. As required by law, the three-member Board consisted of one neutral member, one member associated with the RF & P, and one member associated with the UTU.

7. The UTU member of the Board, C.E. Wible, dissented.

8. Article 28 reads in pertinent part: "No officer, [or] members ... shall resort to the civil courts to correct or redress any alleged grievance or wrong ... until ... [they have] first exhausted all remedy by appeal."

9. Thompson's letter is not part of the record before us.

the feelings that I and the other members hold other than that of exasperation.

From late August 1984 until June 1986, appellants allege that the UTU attempted to dissuade them from filing the contemplated civil action by affirmatively promising them that the contractual problem could be corrected without the necessity of them going to court, presumably by amending the Crew Consist Agreement so as to include the Seaboard employees who had formerly worked at the Hermitage yard. Specifically, in a detailed affidavit, Dement describes how UTU Vice–President Harden promised him during an August 23, 1984 meeting to have results by December 1, 1984. That deadline, according to Dement, was later pushed back by Harden to April 1, 1985. In April 1985 Dement informed Harden of the Seaboard employees' intention to sue. In response, "[Harden] stated that he did not blame us if we did bring legal action, but he felt he could resolve it himself, and would appreciate it if we would allow him to continue and do so. He further stated he would like to keep it out of court." Affidavit, ¶ 11.

Appellants apparently relied on the promises of a union official (Harden) whom, based on prior dealings, they believed they could trust, and who kept invoking the UTU constitutional prohibition against civil suits unless and until internal remedies had been exhausted.[10] Thus, appellants refrained from filing suit at that time. Two appellants, Dement and Hines, kept in constant touch with union officials over the next year in order to check on the progress of attempts by the union to amend the Crew Consist Agreement, an amendment to which the RF & P was apparently willing to agree. As late as May 1986, Vice–President Harden informed appellants that, while the RF & P's UTU local was reluctant to amend the Crew Consist Agreement, Harden thought there was still a way to resolve the problem amicably by invoking internal union procedures without

bringing suit. Although Harden himself imposed a deadline of July 1986 for a peaceful resolution of the Crew Consist Agreement dispute, he continued to delay resolution of the problem. Finally, appellants decided that they could no longer trust their union to accomplish resolution of the dispute through proposed contractual amendments.

On June 10, 1986, appellant Dement wrote one last letter to President Hardin. In pertinent part, the letter read:

> I have talked to [Vice–President] Harden each Sunday since May 11. Each time he indicated he would meet with you the next week and during subsequent conversations he would inform me that the meetings had been cancelled or postponed for one reason or another. On Sunday, June 8, he indicated that he had met with you and that something would be done about the problem shortly. I informed him that we had been in contact with an attorney but would not initiate any action until I hear from him. We agreed that June 29, 1986 would be the final date for his contacting and informing me that this problem has finally been equitably resolved.
>
> With this letter I am notifying you that we are going to seek legal action at that time if there has been no resolution of the problem.

About five months later, appellants filed this suit. The district court, ruling from the bench, dismissed appellants' claims against both the RF & P and the UTU. Without detailing its reasons for so holding, the district court concluded that the complaint failed to state a cause of action against the UTU. The court also concluded that, even assuming the complaint did state such a claim, the claim was time-barred because the statute of limitations began to run in 1984 and the UTU's conduct had not tolled it for any longer than one year. With respect to the RF & P, the court assumed *arguendo* that it had subject mat-

**10.** Dement, in his affidavit, states that many union officials implicitly warned the appellants not to sue by quoting the UTU Constitution to them. *See* Affidavit, ¶ 14.

ter jurisdiction over appellants' complaint,[11] but then concluded that that suit, too, was time-barred.

## II.

■ A so-called "hybrid" suit involves two interrelated claims, one against the plaintiff's labor union and the other against the plaintiff's employer. *See, e.g., DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983). In cases such as the one at bar, "[t]he RLA affords an employee an implied right of action against his union for breach of the duty of fair representation.... An employee may join in this action against the employer and assert that the collective bargaining agreement has been breached if he can allege that the employer's conduct somehow contributed to the union's breach." *Steffens v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees*, 797 F.2d 442, 445 (7th Cir.1986) (citations and footnote omitted).[12] The district court has jurisdiction over a suit against the union for breach of its duty of fair representation regardless of whether or not the employer is joined in the action. *See Hunt v. Missouri Pacific Railroad*, 729 F.2d 578, 580 (8th Cir.1984); *see also, e.g., Harrison v. United Transportation Union*, 530 F.2d 558 (4th Cir.1975) (per curiam), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976).

**11.** Although the court assumed it had jurisdiction, it stated on the record its doubts whether such jurisdiction actually existed.

**12.** Hybrid actions are brought under the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141–187 (1982 & Supp. III 1985), as well as the RLA. Actions under the two statutes differ in one respect: "Under the LMRA the plaintiff's claim against the employer is brought under § 301, 29 U.S.C. § 185, but a[n] RLA plaintiff may not bring a direct claim against the employer because there is no corresponding jurisdictional base [in the RLA]. Instead, the employer is merely joined as a party in the duty of fair representation action. To that extent, such a suit is not a 'true' hybrid action." *Steffens*, 797 F.2d at 445 n. 2.

While the court below did not distinguish among them, appellants appear to assert three separate breaches of the UTU's duty of fair representation towards them. First, they allege that the UTU breached its duty when it entered into the 1979 Crew Consist Agreement. Second, they accuse the UTU of mishandling the hearing before the Board concerning Koenig's claim for pay under the Crew Consist Agreement, and also of failing to seek judicial review of that award. Third, they assert that the UTU failed to obtain the promised amendment to the Crew Consist Agreement which would include the Seaboard employees, even though the RF & P was amenable to such a change. We shall examine each of the three claims separately.

### A.

In negotiating the terms of the Crew Consist Agreement, the RF & P's UTU local had a statutory duty to represent fairly all of its members, "without hostility to any." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *see also Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 202–03, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944); *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406, 412 (4th Cir.1983), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). When carrying out that duty, however, the UTU was entitled to a "wide range of reasonableness" in striking the specific terms of the bargain it reached with the RF & P. *Ford Motor Co.*, 345 U.S. at 338, 73 S.Ct.

For all purposes relevant to this appeal, the legal principles governing the scope and nature of the statutory duty of fair representation are identical with respect to hybrid suits brought under both statutes. One recent indication of this similarity has been the uniform imposition of the six-month statute of limitations applicable to hybrid actions under the LMRA, *see DelCostello, supra*, to hybrid actions under the RLA. *See Triplett v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, Local Lodge No. 308*, 801 F.2d 700, 702 & n. 2 (4th Cir.1986).

Accordingly, except as otherwise required, in this appeal we will apply cases decided under the LMRA and the RLA without distinguishing between the same.

at 686. Thus, in order "[t]o establish a breach of the duty of fair representation, the appellants must show that the [UTU's] conduct was arbitrary, discriminatory or in bad faith." *Sutton,* 724 F.2d at 412 (citing *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967)).

■ We find nothing in the record to indicate that the UTU's conduct in negotiating the Crew Consist Agreement was "arbitrary, discriminatory or in bad faith" within the meaning of *Vaca v. Sipes.* The 1970 Consolidation Agreement contemplated that those Seaboard employees working at the Acca Yard would be subject to the working agreements between the RF & P and the RF & P's UTU local,[13] and the 1979 Crew Consist Agreement was seemingly such a "working agreement." Appellants assert that, by failing to include the Seaboard employees within its terms, the Crew Consist Agreement "discriminates" against them. But the fact that the Seaboard employees do not benefit under the Crew Consist Agreement does not in and of itself constitute "discrimination" amounting to a breach of the union's duty of fair representation. On the contrary, the law is well-settled that "a union may compromise to achieve long-term advantages, even though individual employees may be affected differently by the resulting agreement." *Sutton,* 724 F.2d at 412; *Ford Motor Co.,* 345 U.S. at 338, 73 S.Ct. at 686 (differentiation in treatment of individual employees is inevitable; "[t]he complete satisfaction of all who are represented is hardly to be expected"); *Steele,* 323 U.S. at 203, 65 S.Ct. at 232.

The appellants' complaint makes only conclusory assertions that the UTU's execution of the Crew Consist Agreement was "arbitrary, discriminatory or in bad faith." Appellants have alleged no hard facts to support their claim, in affidavits or otherwise. Accordingly, we agree with the district court that appellants' claim with relation to the Crew Consist Agreement cannot withstand summary judgment. *See Masy v. New Jersey Transit Rail Operations, Inc.,* 790 F.2d 322, 328 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 320, 93 L.Ed.2d 293 (1986).

**B.**

Appellants seemingly contend that the UTU breached its duty of fair representation by mishandling in various ways appellant Koenig's claim before the Public Law Board.[14] They claim that the RF & P UTU local's presentation of Koenig's claim was "deficient," and that two of the Board members were "prejudiced" against Koenig. Appellants apparently also claim that the UTU acted in bad faith in failing to seek judicial review of the purportedly "tainted" Board ruling.

■ We find appellants' contentions without merit. Under the RLA, the UTU had the right to seek judicial review of the Board's ruling in three narrow sets of circumstances:

(1) failure of the ... Board to comply with the requirements of the Railway Labor Act; (2) failure of the ... Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption. 45 U.S.C. § 153 First (q).

*Union Pacific Railroad Co. v. Sheehan,* 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed. 2d 354 (1978) (per curiam). Attacks on the Board's conclusions are not otherwise reviewable by the district court. *See id.; see also Steffens,* 797 F.2d at 447–48 (plaintiffs not entitled to judicial review simply because they disagree with Board's decision).

The various faults appellants find with the Board's ruling implicate only the third basis for judicial review under the RLA,

---

**13.** Section 3 of the Consolidation Agreement provides in relevant part: "Seaboard Coast Line yardmen protecting Acca Yard assignments will be governed by the operating rules and regulations of the RF & P and by RF & P–[UTU] working agreements and representation as to working conditions...."

**14.** Appellants make these allegations in appellant Dement's affidavit. The Public Law Board's decision is not even mentioned in the complaint. However, in any event, we assume the existence of a contention by appellants relating to the handling of Koenig's claim and dispose of it in this opinion.

*i.e.,* that fraud or corruption rendered the Board's ruling invalid.[15] However, appellants' allegations that two of the Board members were "prejudiced" do not amount to a charge of "fraud or corruption" within the meaning of the RLA. First of all, with respect to one of the two Board members in question, the allegation of bias is, to say the least, factually inaccurate. Appellant Dement accuses Board member Wible of bias because Wible was a signatory of the Crew Consist Agreement which the Board was interpreting. Yet the record clearly demonstrates, *see supra* note 7, that Wible *dissented* from the unfavorable ruling and thus *would* have awarded appellant Koenig the extra pay.

As for the other "prejudiced" Board member, whose name was W.E. Griffin, Dement asserts that Griffin was necessarily biased by virtue of his position as the RF & P's Director of Personnel. But without some evidence that Griffin was involved in a conspiracy to deprive Koenig of his contractual rights, the simple fact that he was employed by the RF & P does not provide a ground for judicial review. *See Steffens,* 797 F.2d at 448 (rejecting argument that employer-union collusion infects Public Law Board simply because each Board has one union representative and one company representative); *see also Union Pacific,* 439 U.S. at 94, 99 S.Ct. at 402.

■ Finally, appellants allege that the RF & P's UTU local did "a very deficient job" in presenting Koenig's grievance to the Board. Appellants do not specify in what ways the UTU's performance was so deficient. However, even if that presentation was made in bad faith, absent factual allegations of collusion between the UTU and the Board itself, such flawed presenta-

tion alone does not confer jurisdiction upon the court to review the merits of the Board's ruling. *See Steffens,* 797 F.2d at 448.[16]

At bottom, appellants simply appear to disagree with the Board's conclusions. But however valid appellants' position may be, mere "disagreement with the result [of the Board's decision]" does not permit a district court to substitute its views for those of the Board. *Steffens,* 797 F.2d at 448. Since there was no statutory basis upon which appellants can seek judicial review of the Board's determination, we can hardly say that the UTU acted arbitrarily, discriminatorily, or in bad faith by failing to seek such review.

In sum, we agree with the district court that appellants have not stated a claim with respect to the UTU's handling of Koenig's claim before the Board.

C.

Appellants contend that the UTU acted in bad faith when it failed to seek to amend the Crew Consist Agreement so as to include the Seaboard employees, even though the RF & P may well have been willing so to amend and Vice–President Harden affirmatively promised he would seek to do so.

■ In appraising whether the UTU's handling of the Seaboard employees' grievances amounted to a breach of its duty of fair representation, we must subject the union's conduct in that regard to a stricter standard of review than we did when evaluating its conduct in negotiating the Crew Consist Agreement. *See Schultz v. Owens–Illinois, Inc.,* 696 F.2d 505, 514–15 (7th Cir.1982); Leffler, *Piercing the Duty of*

---

15. Appellants do not in any way argue that the Board failed to comply with the RLA, nor do they deny that the Board's interpretation of the terms of the Crew Consist Agreement was within the statutory scope of the Board's jurisdiction. *See Norfolk and Portsmouth Belt Line Railroad Co. v. Brotherhood of Railroad Trainmen, Lodge No. 514,* 248 F.2d 34, 40 (4th Cir. 1957), *cert. denied,* 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958) (interpretation of pre-existing agreement within jurisdiction of Board). Moreover, in its ruling in this case, the Board noted that it had no jurisdiction to extend the

terms of the Crew Consist Agreement to individuals clearly not covered by it.

16. Whatever claim the appellants have against the UTU for inadequately handling Koenig's grievance would have accrued on June 1, 1984, the day the Board reached a final binding decision. *Freeman v. Local Union No. 135 Chauffeurs, Teamsters, Warehousemen and Helpers,* 746 F.2d 1316, 1319 (7th Cir.1984). We agree with the district court that any such claim is time-barred.

*Fair Representation: The Dichotomy Between Negotiations and Grievance Handling,* 1979 U.Ill.L.F. 35, 37–47. When it addresses the merits of an individual grievance, the union is not entitled to a " 'wide range of reasonableness' " in its conduct. *Schultz,* 696 F.2d at 515 (quoting *Ford Motor Co.,* 345 U.S. at 338, 73 S.Ct. at 686). Instead, as Justice White has written:

> In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances.... In a case such as this, when [the plaintiff] supplied the Union with ... evidence supporting his position, *the Union might well have breached its duty had it ignored [the plaintiff's] complaint or had it processed the grievance in a perfunctory manner.*

*Vaca v. Sipes,* 386 U.S. 171, 194, 87 S.Ct. 903, 919, 17 L.Ed.2d 842 (1967) (emphasis added; citations omitted).

■ In this case, appellants have alleged that the UTU promised to investigate their grievance, and that appellants supplied the UTU with all the information which the UTU requested. Appellants further assert that the RF & P was willing to amend the Crew Consist Agreement, and that UTU officials promised to, but failed to, obtain such an amendment. There are factual proffers made by appellants from which one could infer, as we must on a motion for summary judgment, that the UTU ignored appellants' complaint or treated it perfunctorily. On the other hand, at this stage in the case, the UTU has yet to present evidence which would tend to indicate whether it made a good faith effort to obtain an amendment to the agreement, and, if so, why it failed to accomplish the same. Nor has the UTU intimated that legitimate reasons exist for the months and months of delays in resolving the dispute, which delays, at least as far as the record before us suggests, were all of the UTU's making.

Depending upon what the usual UTU procedure is for resolving grievances of this type, it may well be that the UTU's conduct is not sufficiently egregious to constitute a breach of its duty of fair representation.[17] However, given the current state of the record, we cannot conclude that appellants have failed to state a claim. In our opinion summary judgment was inappropriate, and we therefore remand this portion of the case for further proceedings.

Assuming *arguendo* that appellants have stated a claim, we are also unable to agree with the district court, based upon the existing record, that the statute of limitations conclusively bars such a claim. The statute of limitations applicable to a cause of action for a breach of the duty of fair representation under the RLA is six months. *Triplett v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, Local Lodge No. 308,* 801 F.2d 700, 702 (4th Cir.1986). The statute begins to run at the time the cause of action accrues. *See id.* at 703.

On this record, we find it impossible to answer the question of when the cause of action did accrue. Generally speaking, "a cause of action for breach of the duty of fair representation accrues at the point where the grievance procedure has been exhausted or otherwise breaks down to the employee's disadvantage. It is only at this point that the employee is cognizant of any alleged breach of the duty owed him by the union." *Hayes v. Reynolds Metals Co.,* 769 F.2d 1520, 1522 (11th Cir.1985) (per curiam). The standard is an objective one; namely, when the plaintiff knew, or should have known through the exercise of due diligence, that his claim had accrued. *Dozier v. Trans World Airlines, Inc.,* 760 F.2d 849, 851 (7th Cir.1985). *Accord,* in a non-labor context, *Blanck v. McKeen,* 707 F.2d 817, 819 (4th Cir.) (per curiam), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983).

**17.** For example, "merely negligent handling of an employee complaint will not usually rise to the level of a breach of [the union's] duty of fair representation." *Demars v. General Dynamics Corp.,* 779 F.2d 95, 98 (1st Cir.1985).

Appellants assert that their cause of action did not accrue until June 29, 1986, the date which appellants had agreed with UTU Vice–President Harden would be the last date for Harden to inform appellants that the dispute over amending the Crew Consist Agreement "had finally been equitably resolved." According to appellants, it was only at that point that the union grievance procedure had been exhausted. The district court disagreed, however, concluding instead that "plaintiffs [were] bound to have known after at least a year following [the] 1984 [Public Law Board ruling on Koenig's claim] that the United Transportation Union wasn't going to take any action that would do them any good."

We cannot conclude, at least on the facts before us, that appellants should have known before June 29, 1986 that the UTU would fail to keep its promise to amend the Crew Consist Agreement. Appellants have alleged that the UTU affirmatively asked them to refrain from suit, and represented to them through various officials that it would attempt to resolve the problem without need of civil suit. Appellants, apparently, are loyal union members who were faced with what may have been to them the distasteful prospect of suing their own union hierarchy in a context in which their own union constitution required the exhaustion of internal union grievance procedures before institution of a civil suit.[18] Moreover, rather than sleeping on their rights, appellants allege that they addressed repeated inquiries to their union leaders with respect to the progress of the resolution of their claim. Under the circumstances, it may well have been reasonable for appellants to rely on the promises which Vice–President Harden repeatedly made to them. In any event, at the very least, appellants have alleged sufficient facts to preclude summary judgment on that issue. *See Scaglione v. Communications Workers of America, Local 1395*, 586 F.Supp. 1018, 1021–22 (D.Mass.1983), *aff'd*, 759 F.2d 201 (1st Cir.), *cert. denied*, 474

U.S. 921, 106 S.Ct. 251, 88 L.Ed.2d 259 (1985); *Deboles v. Trans World Airlines, Inc.*, 350 F.Supp. 1274, 1290–91 (E.D.Pa. 1972).

In reaching this conclusion, we find especially persuasive the Second Circuit's recent decision in *King v. New York Telephone Co., Inc.*, 785 F.2d 31 (2d Cir.1986). In reversing the district court's grant of summary judgment with regard to the statute of limitations issue, the Second Circuit, in *King*, relied heavily on plaintiff's allegations that her union had affirmatively represented to her that it could successfully take her case to arbitration even though the deadline for demanding such arbitration had passed. *See* 785 F.2d at 34–35. Writing for the court, Judge Miner observed:

> Indeed, it would be incongruous if the Union's own dilatory conduct could provide it with a defense to this lawsuit, particularly in light of the special relationship between a union and its members. We therefore conclude that a material issue of fact exists as to whether the Union led King to believe that her claims had not yet accrued in August of 1983.

*King*, 785 F.2d at 34–35.

Like Judge Miner, we too find it "incongruous" that if the UTU in this case did purposefully delay the resolution of appellants' claims, it could still escape from the results of its conduct by hiding behind the protection of a statute of limitations. Accordingly, we are not yet ready, on this record, to penalize appellants for what may have been attempts on their part to resolve their grievance within the union framework, as both the RLA and the UTU's own constitution require that they will try to do. *See Santos v. District Council of New York City and Vicinity of United Brotherhood of Carpenters and Joiners of America, AFL–CIO*, 619 F.2d 963, 972 (2d Cir.1980) (Oakes, J., dissenting); *cf. Galindo v. Stoody Co.*, 793 F.2d 1502, 1509–10 &

---

**18.** While the Public Law Board ruling represented the end of all formal appeals with respect to Koenig's claim, the claim which Vice–President Harden addressed was entirely different, apparently outside the ambit of a formal grievance procedure. At least we are not told in this record whether other grievance procedures existed, and if so, what they were.

n. 4 (9th Cir.1986) (discussing similar policies in context of tolling statute of limitations, but suggesting that the length of the period of tolling be carefully limited).[19]

In sum, for the reasons set forth herein in Part II(C), we remand this case to the district court for further proceedings in connection with the merits of appellants' claim that the UTU acted in bad faith when it failed to seek to amend the Crew Consist Agreement, and in connection with the UTU's limitations defense with respect to that claim.

### III.

Appellants contend that the RF & P breached the 1970 Consolidation Agreement in two ways: (1) by excluding Seaboard employees from the Crew Consist Agreement; and (2) by claiming that appellant Dement was not authorized to handle grievances on behalf of Seaboard employees with the RF & P because he was affiliated with Seaboard's UTU local instead of the RF & P's UTU local. While appellants may not have been able under the UTU Constitution to submit a grievance to arbitration without the consent and assistance of their union, it is to be noted that the record does not indicate that appellants at any time sought arbitration of either of the two claims involving the RF & P raised by appellants in this appeal.

The RF & P argues that this court does not have original subject matter jurisdiction over these types of contractual disputes, and may only review them after an arbitration panel has decided them. The railroad further argues that if the court does have jurisdiction, appellants' claims are barred by the statute of limitations. Because we agree with the RF & P that we

lack such jurisdiction, we do not reach the limitations question.

The RLA provides for two distinct methods of dispute resolution depending upon the type of dispute involved. So-called "major" disputes

[relate] to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.

*Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). *See also Norfolk and Portsmouth Belt Line Railroad Co. v. Brotherhood of Railroad Trainmen, Lodge No. 514*, 248 F.2d 34, 39 (4th Cir.1957), *cert. denied*, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958). Under certain circumstances the district court can assume original subject matter jurisdiction over major disputes. *See Goclowski v. Penn Central Transportation Co.*, 571 F.2d 747, 756–57 (3d Cir.1977); *United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 356–57 (8th Cir.1972).

Unlike major disputes, "minor" disputes under the RLA involve "either ... the meaning or proper application of a particular provision [of a collective agreement] with reference to a specific situation or to an omitted case.... [T]he claim is to rights accrued, not merely to have new ones created for the future." *Elgin, Joliet*, 325 U.S. at 723, 65 S.Ct. at 1290; *see also Norfolk*, 248 F.2d at 40.

Minor disputes between the railroad employer and the plaintiff employees are usually within the exclusive jurisdiction of an Adjustment Board. 45 U.S.C. § 153

---

**19.** On the record before us, this does not appear to be a case in which the UTU ever explicitly indicated to appellants prior to June 29, 1986 that it would be impossible to resolve their grievance within the union framework. Construing the facts favorably to the appellants, before June 29, 1986 appellants seemingly had no firm basis from which to conclude that the internal grievance procedures had indeed broken down. *Compare Metz v. Tootsie Roll Industries, Inc.*, 715 F.2d 299, 304 (7th Cir.1983), *cert.*

*denied*, 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984) (union refused to process grievance); *Demars*, 779 F.2d at 98–99 (union told plaintiff "it had done 'all [it] could do'"); *see King*, 785 F.2d at 35 (distinguishing situation in *Metz*). Moreover, unlike the plaintiff in *Metz*, appellants in this case appear to have exercised reasonable diligence in inquiring about the progress of their claim. *See King*, 785 F.2d at 35; *cf. Metz*, 715 F.2d at 304.

First (i); *Peterson v. Airline Pilots Association, International,* 759 F.2d 1161, 1169 (4th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). Plaintiffs have a right to a judicial forum for the resolution of a minor dispute only insofar as they seek to enforce the Adjustment Board's award *after* the Board has decided the dispute.[20] *Harrison v. United Transportation Union,* 530 F.2d 558, 563 (4th Cir.1975) (per curiam), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976); 45 U.S.C. § 153 First (q).

■ The RF & P contends that the dispute is minor because it only requires interpretation of the 1970 Consolidation Agreement. In that regard, the RF & P is entitled to prevail if its position is "not frivolous"—and, if so, we lack original jurisdiction over the dispute. *Kushto v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees,* 818 F.2d 290, 293 (4th Cir.1987); *see also Local 1477 United Transportation Union v. Baker,* 482 F.2d 228, 230 (6th Cir.1973) (dispute is minor if railroad's position "arguable" or "not obviously insubstantial"). Additionally, if a reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor. *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.,* 768 F.2d 914, 920 (7th Cir.1985).

■ In the light of the above standards, the RF & P's position that both of appellants' claims against it involve contractual interpretation and are therefore minor is not at all frivolous. The RF & P's reading of the contract is not strained. With respect to appellants' claim that the Crew Consist Agreement violates the terms of the 1970 Consolidation Agreement, we note that nothing in the Consolidation Agreement expressly guarantees that Seaboard employees will be treated the same as RF & P employees in agreements subsequently entered into by the RF & P and the RF & P's UTU local. Also, even though only RF & P employees benefit from the Crew Consist Agreement, Seaboard employees enjoy privileges under the Consolidation Agreement which RF & P employees do not share, *e.g.,* the ability to bid on jobs at Seaboard as well as the RF & P. On the other hand, appellants' contention that section 3 of the Consolidation Agreement guarantees them additional pay for reduced crew work is not without merit. In any event, it is apparent that any decision on the merits necessarily involves interpreting the terms of the 1970 Consolidation Agreement. Thus, appellants' claim is by its very nature a minor dispute.

Similarly, appellants' allegation that the RF & P violated the Consolidation Agreement by insisting that Dement was not authorized to process grievances on behalf of Seaboard employees also constitutes a minor dispute. Under Section 3 of the Consolidation Agreement, *see supra* note 13, Seaboard employees are subject to certain "working agreements" between the RF & P and the RF & P's UTU local, and must also be represented by the RF & P's UTU local whenever complaints arise under those agreements. According to the RF & P, the Crew Consist Agreement is such a working agreement, and all grievances under that agreement were to be handled by the RF & P's UTU local. The RF & P asserts that since Dement was a *Seaboard* –UTU local official, he was not the representative authorized by the Consolidation Agreement to handle the appellants' complaints. Once again, the resolution of those issues entails interpretation of section 3 of the Consolidation Agreement, which makes the dispute a minor one and means that this court has no original jurisdiction to make such an interpretation.

Accordingly, because we have no subject matter jurisdiction over appellants' claims against the RF & P, those claims are hereby dismissed.[21]

---

**20.** As indicated, *supra,* appellants have not yet submitted either of their claims against the RF & P to an Adjustment Board.

**21.** While there are three exceptions to the exhaustion requirement for minor disputes under 45 U.S.C. § 153, none of them applies in this case. A plaintiff may come directly to a district court in three cases: "'(1) when the employer

**464**

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

K.K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in that part of the majority's opinion dismissing appellants' suit against RF & P for lack of subject matter jurisdiction. Clearly, the position taken by RF & P is "arguable" or "not obviously insubstantial," and thus a "minor" dispute under the RLA. I also agree with the majority's conclusion that appellants failed to state a claim that UTU breached its duty of fair representation in either entering into the Crew Consist Agreement or in presenting Koenig's claim before the Board. I cannot, however, support the majority's view that appellants have alleged sufficient facts to support a third separate claim of breach of a duty of fair representation stemming from UTU's failure to obtain an alleged promise to amend the Crew Consist Agreement.

In order "[t]o establish a breach of the duty of fair representation, the appellants must show that [UTU's] conduct was arbitrary, discriminatory or in bad faith." (citations omitted). The majority freely admits that UTU's conduct in negotiating the Crew Consist Agreement fell far short of this standard. Nor did the majority find merit in appellants' allegation that UTU mishandled Koenig's claim before the Board. The majority's sole basis for reversal in this case is that UTU failed to seek to amend the Crew Consist Agreement when RF & P may have been willing to amend. It is clear from the facts of this case,

however, that UTU was under no duty to seek an amendment of the Crew Consist Agreement. Nor are there facts to support the majority's assertion that Vice–President Harden affirmatively promised that he would seek such amendment.

Assuming, *arguendo*, that UTU did breach its duty of fair representation in regard to this issue, appellants' claim must nonetheless fail as barred by the six-month statute of limitations. Appellant Koenig was initially denied benefits in February, 1982. According to appellants' complaint, Dement contacted the President and Vice–President of UTU in January, 1983, in an attempt to have the Crew Consist Agreement changed. On June 1, 1984, the Board rejected Koenig's claim. Subsequent to that ruling, Dement informed Hardin that he intended to hire an attorney and file suit. Hardin responded by letter dated July 13, 1984, stating that, *inter alia*, "[t]he decisions by Public Law Boards are final and binding on both parties." Appellants did not file their original complaint until November 12, 1986, more than two years after learning of the Board's final decision, and over four years after the initial denial of benefits to Koenig. The majority inexplicably concludes, however, that due to certain vague assertions by Hardin that he would attempt to "resolve" the matter, the appellants have now stated a continuing independent cause of action based on a duty to amend the Crew Consist Agreement which avoids the statute of limitations. In my view, the district court correctly found that "plaintiffs [were] bound to have known after at least a year following [the] 1984 [Public Law Board rul-

---

repudiates the private grievance machinery; (2) when resort to administrative remedies would be futile; and (3) when the employer is joined in a [duty of fair representation] claim against the union.'" *Masy v. New Jersey Transit Rail Operations, Inc.,* 790 F.2d 322, 326 (3d Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 320, 93 L.Ed.2d 293 (1986) (quoting *Sisco v. Consolidated Rail Corp.,* 732 F.2d 1188, 1190 (3d Cir. 1984)).

As appellants apparently have never submitted their claims against the RF & P to an arbitration panel, they are not in a position to argue that either of the first two exceptions applies, nor do they seek to make such an argu-

ment. With respect to the third exception, in order for an employer to be "joined" in a suit within the meaning of that exception, the appellants must allege that the employer, in effect, colluded with the union. *Masy,* 790 F.2d at 327; *Steffens,* 797 F.2d at 445; *Raus v. Brotherhood [of] Railway Carmen of the United States and Canada,* 663 F.2d 791, 798–99 (8th Cir.1981). In this appeal, however, appellants concede that they are unable to allege that collusion occurred between the RF & P and UTU. Therefore, there exists no basis for the district court's original jurisdiction over appellants' claims against the RF & P.

ing on Koenig's claim] that the United Transportation Union wasn't going to take any action that would do them any good."

For the foregoing reasons, I would affirm the district court's decision with respect to both UTU and RF & P. Therefore, I respectfully dissent from that part of the majority's opinion remanding this case for further proceedings in connection with appellants' claim that UTU acted in bad faith when it failed to seek to amend the Crew Consist Agreement.