Richard R. RYDER, Jr., Plaintiff,

v.

PHILIP MORRIS, INC., et al., Defendants.

Civil Action No. 3:96cv519.

United States District Court, E.D. Virginia, Richmond Division.

Nov. 27, 1996.

---

Vickey A. Verwey, David R. Simonsen, Jr., Richmond, VA, for plaintiff.

Jeffrey M. DeBord, Charles R. Sullivan, Hill B. Wellford, Jr., Hunton & Williams, Richmond, VA, for Philip Morris.

Jay J. Levit, Levit & Mann, Richmond, VA, for Union.

## MEMORANDUM OPINION

PAYNE, District Judge.

■ Richard R. Ryder ("Ryder") instituted this "hybrid action" against his employer and union under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Ryder alleges that Philip Morris, U.S.A. ("Philip Morris") discharged him in violation of a collective bargaining agreement. He also alleges that the Bakery, Confectionery and Tobacco Workers International Union, Local Union 203–T ("Union") breached its duty of fair representation by failing to fairly handle his grievance challenging the discharge.[1] (Notice of Removal, Exh. A. Motion for Judgment ¶ 1) (Plaintiff's Mem. in Support of Summary Judgment at 1). The parties filed cross-motions for summary judgment on the question of whether the six month statute of limitations set forth in Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), bars the action.

All parties agree that the appropriate statute of limitations is six months. *See DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). They disagree, however, about when the claim accrued. For the reasons set forth below, the court finds that the claim accrued when Ryder was informed that the Union had voted against submitting his grievance to arbitration on September 11, 1995. The court also finds no reason to toll the statute of limitations, and thus the six month limit set by *DelCostello* bars the present action, which was filed June 5, 1996.

## STATEMENT OF FACTS

Ryder was employed by Philip Morris from October 10, 1977 until he was dis-

---

**1.** This duty is implied under the National Labor Relations Act. *DelCostello v. International Broth-* *erhood of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983).

charged on July 13, 1995. This action was spawned by Ryder's discharge and the alleged failure of the Union to represent him fairly in connection with his grievance concerning the discharge. (Ryder Aff. at ¶ 1).

Throughout his employment, Ryder was a member of the Union. Pursuant to Article II of a collective bargaining agreement, the Union is the exclusive collective bargaining representative for Ryder and the other employees of Philip Morris at Richmond.[2] (Isley Aff. ¶ 3) (Sprouse Aff. ¶ 3) (Jolly Aff. ¶ 2). The collective bargaining agreement in effect at all times pertinent to this action was signed on February 1, 1995. It is entitled "1995 Union Agreement Between Philip Morris U.S.A. and Local # 203–T of the Bakery, Confectionery and Tobacco Workers International Union A.F.L.–C.I.O.–C.L.C." ("Agreement") (Jolly Aff. ¶ 2).

The Agreement provides for a five-step grievance procedure. (Agreement, Article XI). If a matter remains unresolved by the fifth step, the Union Committee of Local 203–T (the "Union Committee"), which consists of seven voting members, can elect to take the grievance petition to arbitration. The Union Committee will only take a grievance to arbitration if it believes that the grievant has a reasonable chance of success on the merits. (Isley Aff. ¶ 2). If arbitration is not requested by the Union Committee, the dispute is deemed settled. Specifically, Article XII of the Agreement states:

> Any dispute arising out of the application or interpretation of this Basic Agreement shall be submitted to arbitration upon the request of the Union in the event that a settlement cannot be reached under the provisions of Article XI.

> A dispute shall be deemed settled unless a written notification requesting arbitration is received by the Employer from the Local Union # 203–T Shop Committee within five (5) working days of the Union's receipt of the Employer's decision at the fifth step of the grievance procedure.

Ryder was no stranger to discipline while he was employed at Philip Morris, having been disciplined on some 35 occasions. And, Ryder's discharge on July 13, 1995 was not the first time his employment with Philip Morris was terminated. Ryder had been discharged from Philip Morris once before on April 4, 1995. (See Ryder Aff. ¶ 3). The Union Committee grieved that discharge on Ryder's behalf; and, at the fifth grievance step, Philip Morris reinstated him on or about May 31, 1995 without back pay. (See Ryder Aff. ¶ 3). However, Ryder was put on terms by virtue of an "undesirable letter," dated May 30, 1995, which warned that any further infractions, including leaving early for or overstaying breaks, would result in the termination of Ryder's employment. (Jolly Aff. ¶ 3).

On July 13, 1995, Ryder was again terminated (Ryder Aff. ¶ 5) because of what Ryder claims to be a "minor infraction": specifically, overstaying a break by three minutes in violation of a company rule and of the terms imposed by the "undesirable letter." Philip Morris and the Union agree that Ryder was late returning from the break, but both deny that constituted the sole reason for his discharge. They contend that the termination is grounded also in the facts that: (i) Ryder also left early for the break; (ii) the infraction occurred just over one month after he received the "undesirable letter;" and (iii) Ryder had been disciplined not less than 35 times during his employment with Philip Morris.

After his termination on July 13, Ryder filed a grievance, alleging that the discharge was without just cause in violation of the collective bargaining contract. (Ryder Aff. ¶ 6). The Union grieved the discharge, but after completing the grievance steps, Philip Morris maintained its position and upheld its termination of Ryder's employment. On September 11, 1995, the Union Committee met and considered whether to take Ryder's grievance to arbitration. The Union Committee unanimously concluded, not surprisingly, that Ryder's grievance did not stand a reasonable chance of success in arbitration on the merits because of his poor work rec-

---

2. Article II provides in part, "This Local union shall constitute the sole bargaining agency for those it represents for the purpose of collective bargaining in all matters pertaining to wages, hours, and working conditions."

ord and because the latest infractions had occurred slightly more than one month following the issuance of an undesirable letter. Accordingly, on September 11, 1995, the Union Committee decided not to take Ryder's grievance to arbitration. (Isley Aff. ¶ 8) (Sprouse Aff. ¶ 7).

Ryder does not dispute that the Union Committee voted against arbitrating his grievance. (Ryder Reply at 2). He also admits that, on the evening of September 11, 1995, he received a telephone call from Daniel Isley, a member of the Union Committee. Isley informed Ryder that the Union Committee had voted against arbitrating Ryder's grievance. (Isley Aff. ¶ 9) (Ryder Supp.Aff. ¶ 3). On the other hand, Ryder claims that he was not told either that his grievance was concluded or that the Union Committee would not continue to process his grievance. (Ryder Supp.Aff. ¶¶ 4–5) (Ryder Reply at 2).

Ryder also claims that Isley continued to speak with him throughout the fall and winter of 1995–96, suggesting that Ryder should talk to management about his grievance, (Ryder Supp.Aff. ¶ 6), and helping Ryder obtain meetings with various Philip Morris officials for that purpose. (Ryder Supp.Aff. ¶ 7). Finally, according to Ryder, Isley advised Ryder to telephone the International Union and gave Ryder the name of a person to contact there. (Ryder Supp.Aff. ¶ 13). Based on his conversations with Isley, Ryder claims that he understood that the Union was interested in his grievance and was open to further action on his behalf.

On September 12, 1995, Jerry Sprouse, President of the Union, sent a letter to Ryder by certified mail. The letter explained that the Union Committee had decided not to pursue arbitration and stated that "no further action will be taken by the Union in this matter." This letter was returned unclaimed, even though it was sent to the correct address.

In the original affidavit filed in support of his motion for summary judgment, Ryder claimed that the Union and Philip Morris told him that Philip Morris would not offer settlement of his grievance, unless and until he withdrew a charge of racial discrimination that Ryder had filed with the Equal Employment Opportunity Commission on July 11, 1995. (Ryder Aff. ¶ 4). Thus, according to Ryder, he requested withdrawal of the EEOC charge. The EEOC issued formal notice of withdrawal in February or March of 1996. (Ryder Aff. at ¶ 10).

However, when the Union and Philip Morris pressed for greater details of this allegation, Ryder subsequently explained that David Parks, Manager of Labor Relations for Philip Morris merely had informed Ryder that he could not speak with Ryder while EEOC charges were pending. Ryder said he would withdraw the charges and then talk to Parks. Parks said that he could not promise anything, but that he could not talk with Ryder while the EEOC charge was pending. After Ryder dropped the charge, Parks allegedly told Ryder there was nothing he could do. Ryder furthermore stated that he arranged several meetings with Philip Morris officials to talk about his discharge. (Ryder Supp.Aff. ¶¶ 8–11).

Ryder contends that, in February or March 1996, after receiving notice of withdrawal of the EEOC charge, and on the advice of the Union, he called the Union's International Representative, Bobby Curtis, to talk about his grievance. (Ryder Aff. at ¶ 10). Several conversations ensued. In the first conversation, on or about March or April 1996, Ryder claims to have told Curtis the facts of his discharge; and Curtis allegedly told Ryder that he would look into the matter and get back to Ryder. (Ryder Aff. at ¶ 11). Ryder contacted Curtis again, and Curtis asked Ryder to send Curtis a letter describing the matter in writing. (Ryder Aff. at ¶ 12). Finally, sometime between April 15 and 23, 1996, Curtis told Ryder that the Union would not assist in proceeding with the grievance. (Ryder Aff. at ¶ 14). On April 28, 1996, Ryder called Curtis for the last time to ensure that the Union's decision was final. When Ryder asked Curtis to send him something in writing, Curtis told Ryder to contact Jerry Sprouse from the Local Union. (Ryder Aff. at ¶ 15). (Ryder Mem. in Supp. at 4).

Ryder called Sprouse on April 29, 1996, confirmed that there was nothing Ryder

could do to cause the Union to proceed, and requested written confirmation of the Union's decision. (Ryder Aff. at ¶ 16). Sprouse stated that a letter had been mailed to Ryder in September, 1995 but had been returned undelivered. On April 29, 1996 Sprouse mailed a letter to Ryder, enclosing the letter dated September 12, 1995. (Ryder Aff. at ¶ 17).

Ryder claims that, until April 15, 1996, he understood that the Union was diligently pursuing his grievance and attempting to obtain reinstatement at Philip Morris. (Ryder Aff. at ¶ 8). Ryder further contends that, before his conversations with Curtis and Sprouse, between April 15–29, 1996, he had no indication that the Union had stopped working on his grievance. (Ryder Aff. at ¶ 9) (Ryder Mem. in Supp. at 5). Within a month after receiving Sprouse's letter of April 29, Ryder had hired an attorney, and this action was filed on June 5, 1996. (Ryder Aff. at ¶ 20).

## DISCUSSION

Ryder filed a motion for partial summary judgment on the affirmative defense of the statute of limitations set forth by Philip Morris and the Union in their Answers. Philip Morris and the Union filed cross-motions for summary judgment on the same issue. For the reasons set forth below, the court grants summary judgment to the defendants and denies Ryder's motion for partial summary judgment.

### A. Standard for Summary Judgment

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion:" and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,'" that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c); *see also Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1338 (4th Cir.1992). Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)); *see also Catawba Indian Tribe*, 978 F.2d at 1338.

In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. Rather, that party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

### B. Accrual of Statute of Limitations

■ In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court held that hybrid suits brought against employers pursuant to Section 301 of the Labor Management Relations Act and against unions for breach of duty for fair representation are governed by the six month statute of limitations set forth in Sec-

tion 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). *Id.* at 170, 103 S.Ct. at 2293. The parties agree that Section 10(b)'s six month limitation applies. (P. Mem. in Support of S.J. at 2). (Philip Morris Cross Motion at 2). The only issue before the court is when the statute of limitations began to run.

The question of when a federal cause of action 'accrues' and the related question of whether it is 'tolled' by subsequent conduct or events are federal questions determined by federal law. . . . The general rule is that a cause of action accrues when the plaintiff knows or should know that a violation of his rights has occurred. *See Cox v. Stanton,* 529 F.2d 47, 50 (4th Cir.1975). In hybrid § 301/fair representation suits, courts have stated that the § 301/fair representation claim arises when the plaintiff could first successfully maintain a suit based on that cause of action, *Santos [v. District Council of New York City & Vicinity of United Brotherhood of Carpenters & Joiners of America],* 619 F.2d [963] at 968–69 [ (2nd Cir.1980) ], or when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation. *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299, 304 (7th Cir.1983), *cert. denied,* 464 U.S. 1070 [104 S.Ct. 976, 79 L.Ed.2d 214] (1984) (and cases cited therein); *Bruch v. United Steelworkers of America,* 583 F.Supp. 668 (E.D.Pa.1984)).

*DelCostello v. International Brotherhood of Teamsters,* 588 F.Supp. 902, 907–8 (D.Md. 1984), *aff'd* 762 F.2d 1219 (4th Cir.1985) (citations omitted in part).

▪ In this action, the acts constituting the alleged violation, the breach of the Union's duty of fair representation, occurred on September 11, 1995 when the Union Commit-

tee voted not to submit Ryder's grievance to arbitration. All parties agree that Ryder was informed of the vote on that date, rendering Ryder's concern about "the loose procedures surrounding notification of the decision . . . of no relevance." *DelCostello,* 588 F.Supp. at 908 n. 18.[3] Based on these facts, the court finds that Ryder discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation on September 11, 1995 and could have instituted an action based on the information he possessed on that date. *See DelCostello,* 588 F.Supp. at 908 (citations omitted); *see also R. Dement v. Richmond, Fredericksburg & Potomac Railroad Company,* 845 F.2d 451, 460–61 (4th Cir.1988) (in cause of action for breach of duty under Railway Labor Act, "[t]he standard is an objective one," namely, "when the plaintiff knew, or should have known through the exercise of due diligence, that his claim had accrued"); *Pantoja v. Holland Motor Exp., Inc.,* 965 F.2d 323, 327 (7th Cir.1992) (" 'the six-month period begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [breach of duty].' ") (citations omitted); *McCreedy v. Local Union No. 971,* 809 F.2d 1232, 1236 (6th Cir.1987) (claim accrues when "claimant discovers or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation; * * * cause of action may arise when Union takes an unequivocal position that it will not seek arbitration"). Thus, Ryder's hybrid claim under Section 301 accrued on September 11, 1995 and is time barred because it was not filed within six months of that date.

Ryder's fundamental disagreement with this conclusion lies in the characterization of

---

**3.** For instance, Ryder claimed that the Union Committee member who informed him of the vote did so as a friend and not as a Union official. Ryder also noted that he did not receive a formal letter from the Union until April 30, 1996. The failure of the Union to ensure that Ryder received written notification could not be deemed a breach of duty by the Union not only because Ryder had actual notice of the decision, but also because the Agreement does not require written notification. *See McLinn v. Boeing Com-*

*pany,* 715 F.Supp. 1024, 1030 (D.Kan.1989) ("Commencement of the limitations period has not been delayed until the employee's receipt of formal written notice if the employee already knew of the adverse decision of the arbitrator or the union.") (citing *Dowty v. Pioneer Rural Elec. Co-op, Inc.,* 770 F.2d 52, 57 (6th Cir.), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 572, 88 L.Ed.2d 557 (1985); *Howard v. Lockheed–Georgia Co.,* 742 F.2d 612, 614 (11th Cir.1984) (and cases cited therein)).

the injury.[4] Specifically, Ryder claims that, although he was informed of the Union Committee's decision on September 11, the statute of limitations began to run no earlier than April 15, 1996 when he understood from Curtis, the Union's International Representative that: (1) the Union would go no further with his case; and (2) further internal appeals would be futile. The court rejects Ryder's argument on both counts, addressing each in turn.

### i. Ryder Did Not Need to Know that the Union Would Not Proceed With His Claim Before His Claim Accrued

Ryder has claimed that he did not know that the Union Committee's vote against submitting his grievance to arbitration meant that the Union had abandoned his claim. *Wilson v. Teamsters,* 83 F.3d 747, 757, 152 LRRM 2165, 2172 (6th Cir.1996) ("a party is not required to sue on a hybrid claim until the arbitration panel renders its final decision, or until the party reasonably should know that the union has abandoned the party's claim") (citing *Schoonover v. Consolidated Freightways Corp.,* 49 F.3d 219, 221–22 (6th Cir.1995)). Ryder alleges that he believed that the Union was still actively pursuing his claim until he was informed otherwise by Curtis, the International Representative.

The court rejects this argument for two reasons. First, the Union had no further duty to handle Ryder's grievance after its decision against arbitration, and Ryder's failure to appreciate the significance of this decision does not change the date of the Union's alleged breach. Second, Ryder should have known that the Committee's decision meant that the Union would not proceed further with his grievance because he had a duty to exercise reasonable diligence, and, upon learning of the Union's decision, he was on inquiry notice.

### a. Ryder's Injury Occurred When the Union Allegedly Breached its Duty by Refusing to Submit the Grievance to Arbitration

■ Ryder's argument that his claim should not accrue until he understood that the Union had abandoned his claim has superficial appeal. It does not, however, survive scrutiny. The underlying claims in this hybrid case are: (1) against Philip Morris for breach of the collective bargaining agreement for its wrongful discharge of Ryder; and (2) against the Union for breach of its duty of fair representation. In the action against Philip Morris, the injury occurred when Ryder was discharged. Thus, the only issue is when the Union caused Ryder the alleged injury which constituted a breach of its duty of fair representation. Only when Ryder knew of this breach, or in the exercise of reasonable diligence should have known of it, would his claim have accrued.

Ryder has attempted to obfuscate this issue by urging the court to find that the injury occurred when he first appreciated the consequences of the Union Committee vote. As explained below, the latest point at which the Union could have breached its duty is when it voted against arbitrating Ryder's grievance. And, because Ryder had actual notice of this alleged breach, his failure to appreciate the significance of the vote makes no difference to the accrual of his claim.

The duty of fair representation is implied under the National Labor Relations Act. *DelCostello,* 462 U.S. at 164, 103 S.Ct. at 2290:

> The duty of fair representation exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the

---

**4.** Additionally, Ryder has contended that the rule of law governing this case provides that the claim accrues when he was "or should have been aware of the injury itself." In support of his position he cites *Benson v. General Motors Corporation,* 716 F.2d 862, 864 (11th Cir.1983) ("For the purpose of determining when the § 10(b) period begins to run, we look to when plaintiffs either were or should have been aware of the injury itself, not to when plaintiffs became aware

of one of the injury's many manifestations."); *Barrett v. Ebasco Constructors, Inc.,* 868 F.2d 170, 171 (5th Cir.1989) ("The statutory period begins to run when the plaintiff either knew or should have known of the injury itself, i.e., the breach of duty of fair representation, rather than of its manifestations."); *Sosbe v. Delco Electronics Div. of G.M.C.,* 830 F.2d 83, 87 (7th Cir.1987). As noted, *infra,* these decisions harm Ryder more than they help him.

unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty and to avoid arbitrary conduct.' *Id.* at 164 n. 14, 103 S.Ct. at 2290 n. 14 (citations omitted).

The collective bargaining agreement involved here provides that the Local Union is the exclusive bargaining agent. (*See* Agreement, Article II). The Agreement also provides for a five step grievance procedure, culminating in arbitration upon the Union's request. (*See* Agreement, Article XI). The Union Committee determines whether a grievance should be submitted to arbitration; and it will only submit a grievance for arbitration if the grievance stands a reasonable chance of success on the merits.

Here the Union grieved Ryder's complaint, and Ryder has not alleged any mishandling of his grievance during the five grievance steps, nor would it make a difference to the accrual of his claim because any mishandling would have antedated the Committee's decision. Under the Agreement, if a dispute is not submitted to arbitration, the dispute is deemed settled. (*See* Article XII, Agreement ("A dispute shall be deemed settled unless a written notification requesting arbitration is received by the Employer from the Local Union # 203–T Shop Committee within five (5) working days of the Union's receipt of the Employer's decision at the fifth step of the grievance procedure.")

Consequently, once the Union Committee decided not to submit Ryder's grievance for arbitration, under the collective bargaining agreement, it had no further contractual duty to handle Ryder's dispute. Ryder's only remedy was extra-contractual. *See Barrett v. Ebasco Constructors, Inc.,* 868 F.2d 170, 171 (5th Cir.1989) (The "scope of the duty of fair representation is coextensive only with the union's statutory authority to act as the exclusive representative of all employees within the bargaining unit." Once a member has " 'access to extra-contractual remedies,' " the "rationale for the duty of fair representation evaporates") (quoting in part, *Freeman v. Local Union No. 135,* 746 F.2d 1316, 1321 (7th Cir.1984)). In the absence of a duty, there certainly could have been no breach by the Union, and thus, the injury to Ryder could only have resulted from the Union's decision not to submit his grievance to arbitration.

Ryder was unequivocally notified of the Union Committee's decision, and the unequivocal statement that the union will not seek arbitration has been held sufficient for a hybrid cause of action to arise. *See McCreedy v. Local Union No. 971,* 809 F.2d 1232, 1236 (6th Cir.1987) (citing *Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp.,* 736 F.2d 896, 902 (3d Cir.1984) ) ("employee's hybrid cause of action may arise when the union takes an unequivocal position that it will not seek arbitration"); *see also DelCostello,* 588 F.Supp. at 909 n. 21 ("When the union notifies the union member that it will not present the union member's claim for resolution by the grievance machinery available under a collective bargaining agreement, the union member knows or should know his claim for breach of fair representation arises.") (dicta); *McLinn,* 715 F.Supp. at 1029 ("In a wrongful termination case, the hybrid action generally accrues when the employee learns or receives notice that the union has refused or neglected to assist him or has decided not to pursue his grievance to the next step for processing.") (citations omitted).

■ Ryder's failure to appreciate the significance of the Union's decision is of no moment in determining the accrual of his injury because the "question is not when the union abandoned its support ... but when the union breached its duty of fair representation." *Barrett,* 868 F.2d at 171; *see also Benson v. General Motors Corporation,* 716 F.2d 862, 864 (11th Cir.1983) (§ 10(b) period begins to run when "plaintiffs either were or should have been aware of the injury itself, not [ ] when plaintiffs became aware of one of the injury's many manifestations."); *compare*

*English v. Whitfield,* 858 F.2d 957, 960 (4th Cir.1988) (under Employee Protection Section of Energy Reorganization Act, as in Section 1983, the ADEA, and Title VII, "in assessing time bar defenses ... proper focus is on the time of the challenged conduct and its notification rather than the time its painful consequences are ultimately felt ..."). Because the Union had no contractual duty after its decision not to take Ryder's grievance to arbitration, there could be no breach of duty after that point. The alleged injury could have occurred no later than September 11, 1995 when the Union decided not to submit Ryder's grievance to arbitration. Because Ryder had actual notice of this decision on September 11, 1995, the six month limitation began to run from that point.

### b. Ryder Should Have Known that the Committee Decision Meant that the Union Had Abandoned His Claim

██ Ryder's claim would still be time barred, even were the court to assume, *arguendo,* that the accrual of his claim depended upon his understanding that the Union Committee's decision meant that the Union would proceed no further with his grievance. In this regard, the appropriate standard for accrual is whether Ryder "discovers, or *in the exercise of reasonable diligence should have discovered,* the acts constituting the alleged violation." *DelCostello,* 588 F.Supp. at 907–8 (emphasis added) (citations omitted); *cf. R. Dement v. Richmond, Fredericksburg & Potomac Railroad Company,* 845 F.2d 451, 460–61 (4th Cir.1988) (under Railway Labor Act the standard is objective, namely, when plaintiff knew, or should have known claim accrued through the exercise of due diligence). *Sosbe,* 830 F.2d 83, 87 (7th Cir.1987) (claim accrues when employee *knew or had reason to know of union's refusal of representation;* this occurred when employee was informed that union could not represent her; thus, refiling and subsequent withdrawal of grievance by union was not controlling); *McCreedy,* 809 F.2d 1232, 1236 (6th Cir.1987) (noting circuit precedent that claim accrues when claimant discovers or *in exercise of reasonable diligence* should have discovered the alleged violation).

██ Applying the controlling standard to this action, the court finds that Ryder should have known, or with the exercise of reasonable diligence should have discovered, that the Union had abandoned his claims when he was told of the Union's decision not to arbitrate his grievance. Indeed, it is undisputed that Ryder was told by Isley, a voting member, that the Union Committee had voted against arbitration on September 11. Ryder has not alleged that Isley told him that the decision not to arbitrate was not an official Union decision. Nor did he claim that Isley told him that the decision was subject to review. The fact that Ryder may have misunderstood the import of his friend Isley's conduct in advising him and in assisting to arrange meetings with Philip Morris officials and the International Union would not change this result. "Speculation or conjecture is not a worthy basis for extending a limitations period." *McLinn,* 715 F.Supp. at 1030.

Additionally, it is not too burdensome to impose a duty of inquiry upon Ryder. In other words, it would not have been exacting for Ryder, once informed of the Union's decision, to ask what the decision meant as to the future of his dispute. *See Nasim v. Warden, Maryland House of Correction,* 64 F.3d 951, 955 (4th Cir.1995) ("for purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim."); *Goins v. Bakery, Confectionery & Tobacco Workers Local Union 203–T,* C.A. No. 3:96cv446, —— F.Supp. —— [1996 WL 779121] (E.D.Va.1996) (finding that had "plaintiff truly not known the status of her grievance, common sense would dictate that Plaintiff would have made a more concerted effort to determine Defendant's position. * * * Meager inquiries represented by [ ] four letters are not evidence of plaintiff's ignorance and do not serve to toll the statute in this case.")

This rule is not as harsh as that imposed by some courts, which do not require a plaintiff to even receive notice of an adverse union decision. Rather, those courts have found that a claim accrues when the decision has

been made without regard to when the plaintiff has notice. *See e.g. Tripp v. Angelica Corp.*, 921 F.2d 794, 795 (8th Cir.1990) ("the cause of action begins to run on the date the union first 'engaged in the acts of unfair representation in the grievance process.' ... the grievance was finally rejected and remedies exhausted when the union members voted not to strike, not when the employee received notice of the union's vote.") (citations omitted).

In essence, Ryder's arguments would impose a duty of "clear statement" on the union. *See generally, Scott v. Local 863, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 725 F.2d 226, 231 (3rd Cir.1984) (Becker, J., concurring). This rule may be desirable because it would avoid potential litigation of the sort here presented. However, as currently fashioned, the law places the duty of reasonable diligence on union members, not on the union. Any shifting of this burden to the union is best accomplished in the union's contract or constitution, not by judicial fiat. In this case, the collective bargaining agreement imposes no such burden upon the Union, not even requiring notification of the Union Committee's decision.[5] And, it is not for the court to adjust that arrangement after the fact. Moreover, there is much to be said for requiring union members to know about and prosecute their own affairs vis a vis the union which represents them.

### ii. Ryder Was Not Pursuing Internal Union Appeals in Contacting The International Union

█ Ryder also asserts that his claim did not accrue on September 11, 1995 because he had a right to appeal to the International Union, which he claims he did in his conversations with Curtis. *See Nicely v. USX Corp.*, 709 F.Supp. 646, 648 (W.D.Pa.1989) ("statute of limitations begins to run when it becomes clear that further internal appeals would be futile").

There is some support in the Fourth Circuit for Ryder's claim that a " 'cause of action for breach of the duty of fair representation accrues at the point where the grievance procedure has been exhausted or otherwise breaks down to the employee's disadvantage.' " *Dement*, 845 F.2d at 460[6] (quoting *Hayes v. Reynolds Metals Co.*, 769 F.2d 1520, 1522 (11th Cir.1985) (per curiam)). In this action, however, although Ryder has claimed that he was pursuing a right to an appeal, he has provided no support for this allegation. Nor did he mention this claim in his supplemental affidavit. Indeed, at oral argument Ryder's counsel was unable to identify any contractual right to appeal, claiming only that it was a union practice.

Moreover, the collective bargaining agreement between the Union and Philip Morris does not provide any right to, or mechanism for, an appeal of the decision not to submit a grievance to arbitration. The Agreement simply states that, if the Union decides against submission, the dispute is deemed settled. *See* Agreement, Article XII. Nor was there evidence presented that an appeal process is set forth in the Union's by-laws or in the International Union's constitution.

Having found no basis in the record to support Ryder's assertion that he had an

---

**5.** *Compare, DelCostello*, 588 F.Supp. at 910 n. 27. In response to plaintiff's assertion that the statute of limitations period did not begin to run until the union affirmatively told the plaintiff that the decision was final, the court stated: "If the union has any duty to tell a union member that a decision of the arbitration committee is final, that duty was fulfilled in this case through the terms of the collective bargaining agreement in which all union members were told that the decision of the Joint Committee is final and binding ... There is no basis for impressing upon the union a duty to inform each union member the date upon which the decision of the Joint Committee is final."

**6.** Although *Dement* involved a Railway Labor Act (RLA) claim, the Fourth Circuit stated that "For all purposes relevant to this appeal, the legal principles governing the scope and nature of the statutory duty of fair representation are identical with respect to hybrid suits brought under both statutes. One recent indication of this similarity has been the uniform imposition of the six-month statute of limitations applicable to hybrid actions under the LMRA ... to hybrid actions under the RLA.... Accordingly, except as otherwise required, in this appeal we will apply cases decided under the LMRA and the RLA without distinguishing between the same." *Dement*, 845 F.2d at 457 n. 12 (citations omitted).

"internal appeal" to exhaust, and there being no issue of material fact, the court finds that Ryder's informal contact with the International Union had no effect on the accrual of his claim. For this reason and for the reasons set forth above, the court finds that Ryder's claim accrued when, on September 11, 1995, he was informed of the Union Committee's decision not to submit his grievance to arbitration. Thus, his action is barred by the statute of limitations unless it has been tolled, the issue to be addressed next.

### C. Tolling of the Statute of Limitations

Ryder claims that, even if his claim accrued on September 11, 1995, the six month statute of limitations was tolled during the time that he was discussing his discharge with Curtis, the International Union representative. According to Ryder, tolling is particularly appropriate because his friend, Isley, continued to assist Ryder respecting the grievance throughout the fall and winter of 1995–96, thereby suggesting the presence of an appeal process. Further, Isley's actions, Ryder contends, should estop the Union from asserting the statute of limitations.

### i. The Statute of Limitations Was Not Tolled During Ryder's Contact With International Union Officials

 Having already decided that Ryder's so-called "appeal" to the International Union did not constitute an "internal appeal" of the sort which can provide the basis for the non-accrual of a claim, the court rejects Ryder's concomitant theory that his hybrid Section 301 claim was tolled while he communicated with the International Union representative and the management of Philip Morris. It is true that pursuit of internal appeals can toll the statute of limitations. *Frandsen v. Brotherhood of Ry., Airline & S.S. Clerks,* 782 F.2d 674, 681 (7th Cir.1986) (holding that "statute of limitations is tolled by pursuit of internal union remedies, even where those remedies are ultimately determined to be futile"); *Walker v. Teamsters Local 71,* 714 F.Supp. 178, 189 (W.D.N.C.

1989), *aff'd in part and rev'd in part sub nom., Walker v. Consolidated Freightways,* 930 F.2d 376 (4th Cir.1991) ("Any reasonable effort by the plaintiffs to exhaust remedies, however futile, tolls the statute of limitations."). However, Ryder cannot take refuge in that principle because no such appeals procedure existed here. Indeed, Ryder did not allege that he followed any formal appeal process but merely stated that he met with Philip Morris officials and called Curtis, a representative of the International Union.

Informal conversations, such as these, do not toll the limitations period. "Otherwise, a plaintiff could indefinitely delay resolution of Labor disputes merely by bombarding his union with tiresome requests ..." *Sosbe,* 830 F.2d at 87 (letters and phone calls to company and international union officers, seeking their help, does not toll the six month time limit) (quoting *Dozier v. Trans World Airlines,* 760 F.2d 849, 852 (7th Cir.1985); *Legutko v. Local 816, International Brotherhood of Teamsters,* 853 F.2d 1046, 1054 (2nd Cir.1988) ("Informal correspondence should not toll the statute of limitations."); *cf. Mincey v. United States Postal Service,* 879 F.Supp. 567, 573 (D.S.C.1995) (accrual of claims). Ryder's communication with Philip Morris officials and the International Union were "simply a general appeal for help, not the invocation of a formal union procedure." *Pantoja,* 965 F.2d at 328 (letter to international union and local union's legal counsel did not serve to toll limitations period; "if it did then plaintiffs could toll the period forever simply by going up the ladder of union officials, informally asking each one for help."). Moreover, to toll the statute of limitations on facts such as those presented here would frustrate the rule which permits the tolling of claims during the pursuit of internal appeals in order to "encourage union members to pursue internal remedies." *Sosbe,* 830 F.2d at 87.

Having found that Ryder was not pursuing internal union appeals, his contact with the International Union does not provide a reason to toll the statute of limitations.[7] The

---

7. At the motions hearing defendant's counsel claimed that Ryder did not begin his so-called "appeal" to the International Union until six

months after his claim accrued. In Ryder's first affidavit, however, he claimed that his first contact with Curtis occurred in March or April 1996.

only remaining issue for this court is whether the statute of limitations should be equitably tolled because of the actions of Isley, the union official who assisted Ryder in contacting Philip Morris, and the actions of the International Union official respecting Ryder's discharge.

### ii. Equitable Estoppel and Equitable Tolling

Ryder asserts that Isley's assistance should estop the Union from claiming that Ryder's action is time-barred. Thus, the court must examine whether equitable estoppel or equitable tolling would preserve the viability of Ryder's claims. The Fourth Circuit addressed the interrelated issues of equitable estoppel and equitable tolling in *C.M. English v. Pabst Brewing Company*, 828 F.2d 1047 (4th Cir.1987). According to the Fourth Circuit:

> Equitable exceptions to the statutory limitations period should be sparingly applied ... The certainty and repose these provisions confer will be lost if their application is up for grabs in every case. * * * The doctrines of equitable tolling and equitable estoppel have a common origin; they are based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time. * * * Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action ... To invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge ... Equitable estoppel applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline ... 'The statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in timely fashion is the conse-

quence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.'

*C.M. English*, 828 F.2d at 1049 (citations omitted).

Thus, to establish equitable tolling, Ryder must show that the Union wrongfully deceived him in order to conceal the existence of his claim. In addition, Ryder must show that he reasonably relied upon the Union's misrepresentation by neglecting to file a timely charge. In this case, there exists no evidence that the Union or any official wrongfully deceived or misled Ryder. Even assuming that Ryder's allegations about Isley are true, at most, Isley helped Ryder pursue channels outside the Local Union, such as setting up meetings with Philip Morris officials and the International Union. Ryder's contacts with such officials are probative, but not dispositive, of only one of the two elements necessary to prove equitable tolling, namely, reasonable reliance. Ryder has not shown, and no evidence exists in the record to show, that Isley misrepresented the finality of the Union Committee's vote to Ryder. Nor is there evidence that Isley deceived Ryder as to the prospect that the Union would change its position. That Ryder may have misunderstood the import of Isley's voluntary assistance does not justify a finding of equitable tolling, "which is based on the wrongdoing of the defendant." *C.M. English*, 828 F.2d at 1050.

There is one further point the court must address. At one time Ryder had claimed that he had been told by Union and company officials that if his EEOC charge were withdrawn, the company might be willing to change its position regarding his grievance. Thus, Ryder requested withdrawal of his EEOC charge, and the EEOC issued formal notice of withdrawal on February 8, 1996. Such facts arguably could support a finding of equitable tolling or estoppel. However,

---

If the call was placed in early March, the claim would not be time-barred since the court has found that it accrued on September 11, 1995. Thus, there exists a genuine issue of material fact regarding the first date of contact, and it is

inappropriate for the court to resolve this issue on summary judgment. It is unnecessary to a resolution of this case, however, because the court has already concluded that the action was not tolled for other reasons.

Ryder's supplemental affidavit about this issue declared only that Parks, Manager of Labor Relations for Philip Morris, stated that he could not speak with Ryder while EEOC charges were pending. And, when Ryder told Parks that he would withdraw the charges and then talk to him, Parks said that he could not promise anything. After the charges were dropped, Parks told Ryder there was nothing he could do.

As modified by Ryder's subsequent affidavit, these events provide no evidence to support a finding that the Union wrongfully misled or deceived Ryder about the finality of the Committee's decision not to submit Ryder's grievance to arbitration. And, Ryder's "optimistic hopes" that the Union or the company would change its decision "falls short of demonstrating the reasonable reliance on defendant's conduct or representations necessary to justify equitable tolling." *Lawson v. Burlington Industries, Inc.,* 683 F.2d 862, 864 (4th Cir.), *cert. denied,* 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982) (citing *Naton v. Bank of California,* 649 F.2d 691 (9th Cir.1981); *Wagner v. Sperry Univac,* 458 F.Supp. 505 (E.D.Pa.1978), *aff'd mem,* 624 F.2d 1092 (3d Cir.1980)).

Finally, the court finds insufficient evidence to support a finding of equitable estoppel. Under *C.M. English,* 828 F.2d 1047, to prove equitable estoppel, Ryder must show that his failure to file in a timely fashion was the consequence either of a deliberate design or of actions that unmistakably would cause the employee to delay filing his charge. Ryder did not show that Isley assisted him in contacting the International Union and Philip Morris officials in an effort to deliberately (or knowing that such help would) make Ryder delay the filing of his charge. Indeed, as Ryder's friend, Isley should not "unmistakably" have known that his help to Ryder would cause a delay in the filing of the present action.[8]

In conclusion, having found that the alleged breach of the Union's duty of fair representation could have occurred no later than September 11, 1995 when the Union decided against submitting Ryder's grievance to arbitration, and because Ryder knew of this decision on the same date, Ryder's hybrid cause of action accrued on September 11, 1995. Finding no reason to toll the statute of limitations, Ryder's action is time barred and summary judgment is granted for the defendants.

It is so ORDERED.

---

8. Ryder relies upon the case *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995) in support of his equitable estoppel claim. *Buttry* stated that to "invoke equitable estoppel, a plaintiff must show that (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." (citations omitted). Ryder's claims would also fail under this test because there is no evidence to support either element.